BURRITT MUTUAL SAVINGS BANK OF NEW BRITAIN *v.* TRANSAMERICA INSURANCE COMPANY

COTTER, C. J., LOISELLE, SPEZIALE, PETERS and HEALEY, Js.

Argued December 11, 1979—decision released March 11, 1980

*John W. Lemega,* with whom, on the brief, were *Joseph G. Lynch* and *Richard C. Tynan,* for the appellant (defendant).

*Harold J. Eisenberg,* for the appellee (plaintiff).

PETERS, J. This case concerns the liability of an insurance company under a mortgage loss payable clause after the mortgagee's foreclosure on the insured property. The plaintiff mortgagee, Burritt Mutual Savings Bank, brought an action against the defendant, Transamerica Insurance Company, to recover $15,000, which was the amount of the adjusted value of the loss insured by the defendant. The defendant filed an answer, several special defenses, and a third-party complaint against three third-party defendants, Richard V. Pizzuto, Ricky's Restaurant, Inc., and the Connecticut Bank and Trust Company. The Connecticut Bank and Trust Company in turn filed a cross complaint against the other two third-party defendants, Pizzuto and Ricky's Restaurant, Inc. After trial to the court, *Missal, J.,* judgment was rendered in the plaintiff's favor against the defendant Transamerica, and in the third-party plaintiff Transamerica's favor against Pizzuto; no judgment was rendered either for or against Connecticut Bank and Trust Com-

pany.   Although notices of appeal were originally filed by all of the interested parties, only the appeal of the defendant Transamerica has been pursued in this court.[1]

There is little dispute about the underlying facts as contained in the findings of the trial court.  Burritt Mutual Savings Bank (hereinafter Burritt Mutual) lent Richard V. Pizzuto $30,000 on January 7, 1971, and received in return a promissory note and a mortgage on real property located at 209-211 Whitney Street, Hartford.  This property was then covered by a multiperil insurance policy issued by the defendant Transamerica Insurance Company (hereinafter Transamerica) ; Burritt Mutual's name was duly entered upon the insurance policy as first mortgagee, replacing previously designated mortgagees.  Five months later, on June 17, 1971, while the policy was in full force and effect, a fire occurred on the premises causing substantial damage.  Richard Pizzuto, the named insured and the mortgagor, hired a firm of insurance adjusters, and on October 15, 1971, the loss was adjusted in the amount of $15,000.  Transamerica then issued a negotiable instrument[2] for $15,000 payable jointly to Pizzuto, to the adjustment firm that had represented Pizzuto, and to Burritt Mutual.  This instrument was delivered by the adjusters, with their indorsement, to Pizzuto, who indorsed his own name, and that of Ricky's Restaurant (an establishment that Pizzuto owned).  The instrument also

---

[1] The appeal taken by the Connecticut Bank and Trust Company was dismissed, on motion, because of the absence of a final judgment with respect to it.

[2] There is a dispute between some of the parties as to whether the instrument, which was payable through the Fidelity Philadelphia Trust Company, was a draft or a check.  For present purposes, the question is not relevant.

came to have the indorsement of Burritt Mutual, without the authorization of Burritt Mutual or any of its officers, employees or agents. The instrument was deposited by Pizzuto in the Connecticut Bank and Trust Company, which duly forwarded it for collection and payment. The instrument was in fact paid but Burritt Mutual never received any of the proceeds.

Burritt Mutual did not discover that the mortgaged property had been damaged until July 28, 1971. Although it promptly notified A. T. Lindquist Agency, Transamerica's local agent, it did not communicate with Transamerica itself until July 21, 1972. When Burritt Mutual learned, in the process of this communication, that it had been designated as a payee on an instrument that it had not received, it repeatedly demanded payment of the fire loss from Transamerica.

The fire loss resulted in a marked deterioration in the relationship between the value of the mortgaged property and the amount of the outstanding indebtedness, since the insured did not use the insurance proceeds received from Transamerica to repair the mortgaged property.[3] Before the fire, when the mortgage loan was first executed in the amount of $30,000, the property had been valued at $42,000. After the fire, the indebtedness never fell below $29,500, while the value of the property diminished substantially, so that when foreclosure proceedings were instituted after default in September of 1972, the property was assessed at only $27,000. The foreclosure proceedings led to a judg-

---

[3] Burritt Mutual had mortgage impairment insurance of its own, with another insurance carrier. That carrier was notified of Burritt's problem with the Transamerica insurance, and a claim under that insurance is still pending.

ment of strict foreclosure in December of 1972, and the property was thereupon resold, the following April, at a price of $21,300, which, after deduction of costs, gave Burritt Mutual a net recovery of $19,826.53. Although Pizzuto's indebtedness at the time of foreclosure was adjudicated to have been $35,186.01, Burritt Mutual never made any effort to initiate a deficiency claim against Pizzuto. The fire in effect destroyed the lender's cushion of security and the debtor's equity of redemption. Transamerica's failure to get the insurance proceeds to Burritt Mutual in turn led to the foreclosure. Had Burritt Mutual been paid, it is not likely that Pizzuto would have permitted the foreclosure to proceed as it did.

Burritt Mutual's cause of action is a suit for $15,000 on the basis of rights emanating from the multiperil insurance policy issued by Transamerica. It is not a suit on the negotiable instrument in that amount that was drawn by Transamerica. Presumably this choice of actions was determined by the fact that Burritt Mutual has consistently maintained, as the trial court found, that it had never received possession of this instrument. Burritt Mutual could not sue on an instrument on which it was neither holder nor transferee. Cf. General Statutes § 42a-3-804.

The insurance clause that is at issue is a "standard" or "union" mortgage loss payable clause.[4]

---

[4] The mortgage clause is part of the policy's section on conditions. Conditions are designated as part IX of the policy. The mortgage clause is paragraph C in the conditions. The policy itself was Exhibit C. It reads as follows:

"Mortgage Clause: Applicable to buildings only (this entire clause is void unless name of mortgagee (or trustee) is inserted in the Declarations): Loss, if any, under this policy, shall be payable to the mortgagee (or trustee), named on the first page of this policy,

This clause, in contradistinction to an "open" loss payable clause, creates a direct contractual relationship between the mortgagee and the insurer. *Savings Bank of Ansonia* v. *Schancupp*, 108 Conn. 588, 594–95, 144 A. 36 (1928); *Collinsville Savings Society* v. *Boston Ins. Co.*, 77 Conn. 676, 680, 60 A. 647 (1905); 5A Appleman, Insurance Law and Practice (Rev. Ed.) § 3401.

as interest may appear under all present or future mortgages upon the property herein described in which the aforesaid may have an interest as mortgagee (or trustee) in order of precedence of said mortgages, and this insurance as to the interest of the mortgagee (or trustee) only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property, nor by any foreclosure or other proceedings or notice of sale relating to the property, nor by any change in the title or ownership of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by this policy: provided, that in case the mortgagor or owner shall neglect to pay any premium due under this policy, the mortgagee (or trustee) shall, on demand, pay the same. Provided also, that the mortgagee (or trustee) shall notify the Company of any change of ownership or occupancy or increase of hazard which shall come to the knowledge of said mortgagee (or trustee) and, unless permitted by this policy, it shall be noted thereon and the mortgagee (or trustee) shall, on demand, pay the premium for such increased hazard for the term of the use thereof, otherwise this policy shall be null and void. The Company reserves the right to cancel this policy at any time as provided by its terms, but in such case this policy shall continue in force for the benefit only of the mortgagee (or trustee) for ten days after notice to the mortgagee (or trustee) of such cancellation and shall then cease, and the Company shall have the right, on like notice, to cancel this agreement.

Whenever the Company shall pay the mortgagee (or trustee) any sum for loss under this policy, and shall claim that, as to the mortgagor or owner, no liability therefor existed, the Company shall to the extent of such payment, be thereupon legally subrogated to all the rights of the party to whom such payment shall be made, under all securities held as collateral to the mortgage debt, or may at its option pay to the mortgagee (or trustee) the whole principal due or to grow due on the mortgage, with interest accrued and shall thereupon receive a full assignment and transfer of the mortgage and of all such other securities; but no subrogation shall impair the right of the mortgagee (or trustee) to recover the full amount of said mortgagee's (or trustee's) claim."

Transamerica does not dispute that at the time of the fire loss, the mortgage clause created rights in Burritt Mutual, and that this loss was thereafter appropriately adjusted in the amount of $15,000. Indeed Transamerica's issuance of its negotiable instrument in that amount, payable to Burritt Mutual as one of the joint payees, confirms its acknowledgement of the legitimacy of Burritt Mutual's initial claim. Transamerica argues instead that Burritt Mutual's subsequent procurement of a decree of strict foreclosure, without timely reservation of a deficiency claim against Pizzuto, extinguished both the mortgage debt and Burritt Mutual's entitlement to recovery as mortgagee under the mortgage clause. By contrast, Burritt Mutual maintains, as the trial court concluded, that its rights under the insurance contract vested when the fire loss was adjusted, and that those rights, in the amount of $15,000, were not subject to divestment. Although each position has some merit and some support in the case law, we have decided, under the facts of this case, to adopt an intermediate stance.

Difficulties created by the language of the standard loss payable clause are, not surprisingly, at the heart of the claims that we must resolve. On the one hand, the clause states that "[l]oss . . . shall be payable to the mortgagee . . . as interest may appear under all present or future mortgages," and this wording indicates that extinction of its mortgage would be fatal to the mortgagee's claim. On the other hand, the clause goes on to state that "as to the interest of the mortgagee," the insurance shall not be invalidated "by *any* foreclosure . . . nor by *any* change in the title or ownership of the property," (emphasis added) and that wording lends

support to the mortgagee's continued right to the insurance proceeds so long as it retains any interest, even ownership, in the insured property. Needless to say, if the wording is open to two or more reasonable constructions, the clause must, by familiar principles, be construed against the insurance company that was its draftsman. *Roby* v. *Connecticut General Life Ins. Co.,* 166 Conn. 395, 402, 349 A.2d 838 (1974); *Scranton* v. *Hartford Fire Ins. Co.,* 141 Conn. 313, 315, 105 A.2d 780 (1954); Restatement (Second), Contracts § 232 (Tentative Draft, 1973). Insurance companies have had ample opportunity to note and to respond to the extensive and confusing case law that this clause has generated.

It is useful first to examine the line of cases that has upheld the mortgagee's right to recover insurance proceeds despite foreclosure proceedings that discharged the mortgage indebtedness. The cases emphasize the independence of the contract created by the standard mortgage clause; some rely on language in 8 Couch on Insurance 2d (1961), § 37:1162, p. 670, that, under a standard mortgage clause, the mortgagee's "acquisition of title to the insured property is generally regarded as an increase of interest, rather than a change of ownership," to buttress their conclusion that the mortgagee continues to have an insurable interest. See, e.g., *Nationwide Mutual Fire Ins. Co.* v. *Wilborn,* 291 Ala. 193, 197, 279 So. 2d 460 (1973); *Federal National Mortgage Assn.* v. *Hanover Ins. Co.,* 243 Ga. 609, 255 S.E.2d 685 (1979); *City of Chicago* v. *Maynur,* 28 Ill. App. 3d 751, 754, 329 N.E.2d 312 (1975); *Federal National Mortgage Assn.* v. *Great American Ins. Co.,* 157 Ind. App. 347, 350, 300 N.E.2d 117 (1973); *Federal National Mortgage Assn.* v. *Ohio Casualty Ins. Co.,* 46 Mich. App. 587, 590, 208 N.W.2d 573 (1973);

*Haskin* v. *Greene,* 205 Or. 140, 147–48, 286 P.2d 128 (1955). Although in the cited cases the underlying facts about the relationship between the debt and the foreclosure sale are not always entirely clear, at least in *Haskin,* supra, the foreclosure sale had been for the full amount of the debt and the judgment, and yet recovery of insurance moneys was allowed.

These cases permitting a mortgagee to claim insurance proceeds despite satisfaction, by foreclosure, of its mortgage and mortgage debt are all however distinguishable. Possibly it matters that they involve jurisdictions in which foreclosure is foreclosure by sale, rather than strict foreclosure; in at least one of the cases, *City of Chicago* v. *Maynur,* the time for redemption had not yet expired at the time of litigation. More significant is the relationship in timing between the foreclosure and the fire. In these reported cases, the foreclosure proceedings were initiated *before* the occurrence of the loss covered by the insurance. "[T]he amount bid at the foreclosure was for the property in an undamaged condition and the mortgagee required the insurance proceeds to restore the property to the condition it was in at the time of the foreclosure." *City of Chicago* v. *Maynur,* supra, 755. These cases therefore do not control the proper allocation of insurance proceeds when, as in the case before us, the fire antedates both default and foreclosure.

The alternate line of cases limits the mortgagee's right to recover insurance proceeds to the extent that foreclosure proceedings have discharged the mortgage indebtedness. A leading case is *Whitestone Savings & Loan Assn.* v. *Allstate Ins. Co.,* 28 N.Y.2d 332, 270 N.E.2d 694 (1971), in which the

mortgagee who had made a bid equal to the full amount of the secured debt at the foreclosure sale in order to obtain the mortgaged property was held to have lost its insurable interest under a mortgage loss payable clause. This case, and other cases such as *Calvert Fire Ins. Co.* v. *Environs Development Corporation,* 601 F.2d 851, 856 (5th Cir. 1979); *Insurance Co. of North America* v. *Citizens Insurance Co. of New Jersey,* 425 F.2d 1180, 1182 (7th Cir. 1970); *Rosenbaum* v. *Funcannon,* 308 F.2d 680, 684–85 (9th Cir. 1962); *Sea Isle Operating Corporation* v. *Hochberg,* 198 So. 2d 336, 337 (Fla. App. 1967); *Lembo* v. *Parks,* 372 N.E.2d 1316, 1317 (Mass. App. 1978); *Hellman* v. *Capurro,* 92 Nev. 314, 549 P.2d 750 (1976); and *Power Building & Loan Assn.* v. *Ajax Fire Ins. Co.,* 110 N.J.L. 256, 258, 164 A. 410 (1933), emphasize that insurance proceeds, with respect to a mortgagee, serve only as collateral security for payment of the underlying indebtedness, and that a mortgagee is entitled to no more than one satisfaction of his debt. Although, under a standard mortgage loss payable clause, neither foreclosure proceedings per se nor extinguishment of the mortgage by a foreclosure affects the insurer's liability to the mortgagee, "the full or partial extinguishment of the mortgage debt itself, whether prior to or subsequent to the loss, will preclude, to the extent thereof, any recovery on the policy by the mortgagee." 5A Appleman, Insurance Law and Practice § 3403, p. 302 (1970); 5 Couch on Insurance 2d §§ 29:75–29:77 (1960).

This second line of cases represents factual patterns that approximate the situation presented by the case before us, in that they deal with cases in which the loss has preceded the foreclosure. In these cases, as in ours, the foreclosure sale *after* the

fire was a sale of property already damaged as to which insurance proceeds were already in the contemplation of the parties. In *Whitestone Savings & Loan Assn.* v. *Allstate Ins. Co.,* supra, the mortgagee argued, therefore, as does the mortgagee here, that its rights were determined at the time of the fire loss. To this argument, the court rejoined (p. 334): "What seems to have caused confusion is the equally well-settled rule that the rights under a fire insurance policy are fixed both as to amount and standing to recover at the time of the fire loss. From this rule it has been further and improperly deduced that the mortgagee could do nothing to impair his rights thus fixed at the time of loss. And of course he could: by waiver, estoppel, assignment, or as here by discharge of the debt." Although the cases cited involve foreclosure by sale, rather than strict foreclosure, we agree with the logic of their reasoning that satisfaction of the mortgage debt extinguishes a mortgagee's insurable interest under a mortgage loss payable clause. See *Kligerman* v. *Union & New Haven Trust Co.,* 127 Conn. 622, 624–25, 18 A.2d 683 (1941); *Moran* v. *Kenai Towing & Salvage, Inc.,* 523 P.2d 1237, 1239–40 (Alaska 1974); *Lembo* v. *Parks,* supra; 1 Jones, Mortgages § 396 (6th Ed. 1904). The trial court was therefore in error in concluding that Burritt Mutual was entitled to recover $15,000, the amount at which the fire loss was adjusted, without regard to the judgment of foreclosure.

The question that remains to be resolved is whether, under the facts of the present case, it is correct to say that the foreclosure judgment should be deemed in law to represent a full satisfaction of the mortgage indebtedness. Professor Keeton cautions that "inequitable results may be produced if

a court regards the debt as wholly satisfied when the mortgagee has in fact received less than full payment." Keeton, Basic Text on Insurance Law 188, n.4 (1971). Although Burritt Mutual's failure to seek a deficiency judgment in accordance with the procedural requirements of General Statutes § 49-14 prohibits further action against Pizzuto, the underlying debtor; *Simsbury Bank & Trust Co.* v. *Ray Carlson Lumber Co.*, 154 Conn. 216, 219, 224 A.2d 544 (1966); there is no reason to apply this prohibition to Transamerica, against whom Burritt Mutual expressly reserved its rights in a series of letters in 1972,[5] and who was not a party to the strict foreclosure.

We cannot, on the record before us, determine whether or not Burritt Mutual has in fact received full payment. There is no specific finding about the mortgage debt at the time of the foreclosure, although the court's finding refers to Burritt Mutual's Exhibit E, the judgment of strict foreclosure, which found the mortgage debt to have been $34,869.16 and ordered payment of that amount with interest and costs. Transamerica relies on other findings that fix the indebtedness, at different times, in a lower amount. We cannot resolve this ambiguity. Nor is it self-evident what value should be assigned to the property that was foreclosed. The value that must be found is the value of the property at the time of foreclosure. There

[5] Although Transamerica's assignment of errors challenged the trial court's conclusion that Burritt Mutual had expressly reserved its claim to the fire loss proceeds, the brief on appeal does not address this issue and does not contest receipt of the letters from Burritt Mutual. This assignment of error is therefore deemed abandoned. *Gould* v. *Rosenfeld*, 178 Conn. 503, 506, 423 A.2d 146 (1979); *O'Connor* v. *Dory Corporation*, 174 Conn. 65, 70, 381 A.2d 559 (1977).

is no specific finding that determines this value. Burritt Mutual claims that the fair market value is to be taken as $19,826.35, the net amount it received on a private resale, but Transamerica was not a party to that resale, and cannot be bound by it; furthermore, that resale does not necessarily measure the value of the property at the right time. Our statutes provided a methodology for final and conclusive valuation of mortgaged property after foreclosure; General Statutes § 49-14;[6] of which Burritt Mutual might have availed itself but did not. Cf. *New Haven Savings Bank* v. *General Finance & Mortgage Co.*, 174 Conn. 268, 270–71, 386 A.2d 230 (1978); *Simsbury Bank & Trust Co.* v. *Ray Carlson Lumber Co.*, supra, 219–20. Under these circumstances, we agree with Transamerica that Burritt Mutual is estopped from proving that the property was worth less than the $27,000 value found by the appraiser that it hired to pre-

---

[6] General Statutes section 49-14 in pertinent part provided: "APPRAISAL OF MORTGAGED PROPERTY AFTER FORECLOSURE. DEFICIENCY JUDGMENT. Upon the motion of any party to a foreclosure, the court shall appoint three disinterested appraisers, who shall, under oath, within ten days after the time limited for redemption has expired, appraise the mortgaged property and shall make written report of their appraisal to the clerk of the court where such foreclosure was had. . . . [S]uch appraisal shall be final and conclusive as to the value of such mortgaged property. The mortgage creditor, in any further action upon the mortgage debt, note or obligation, shall recover only the difference between the value of the mortgaged property as fixed by such appraisal and the amount of his claim; and the court in which such action is pending may, if such appraisal and report thereof have been made, render judgment for the plaintiff for the difference between such appraisal and the plaintiff's claim, provided application for such deficiency judgment has been made by the plaintiff within ninety days after the time limited for redemption has expired. . . ." Section 49-14 was repealed in 1979 because of this court's decision in *Society for Savings* v. *Chestnut Estates, Inc.*, 176 Conn. 563, 577, 409 A.2d 1020 (1979) and has been superseded by Public Acts 1979, No. 79-110.

pare an estimate for foreclosure purposes. Transamerica, which was not a party to this appraisal and which could not have invoked § 49-14, since it was not a party to the foreclosure, is entitled to an opportunity to demonstrate that the property at the time of appraisal was worth more than $27,000. Further proceedings are therefore required to resolve these underlying questions of fact to determine whether the appropriation by strict foreclosure of the mortgaged property has equitably satisfied the mortgage debt.

In the event that Burritt Mutual can establish that it has not received full satisfaction from the judgment of foreclosure, it will have a right to recover its loss, pro tanto, from Transamerica. Transamerica in turn will be entitled to a recovery on its third-party complaint against Pizzuto.

We have reviewed neither the findings of fact nor the conclusions of law reached by the trial court in the third-party action between Transamerica and Connecticut Bank and Trust Company. The trial court's memorandum of decision reserved, for a further hearing, the determination of factual questions relevant to that cause of action. Presumably because that factual hearing was never held, the trial court entered no judgment for or against Connecticut Bank and Trust Company, although its finding addresses the claims that were raised. Further proceedings will be required on this matter as well.

There is error and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other judges concurred.