**Ronald R. HULL and Jan M. Hull, husband and wife, and Edward D. Hull and Carole A. Hull, husband and wife, Appellants,**

v.

**ALASKA FEDERAL SAVINGS & LOAN ASSOCIATION OF JUNEAU, Appellee.**

No. 6346.

Supreme Court of Alaska.

Jan. 21, 1983.

---

Thomas L. Melaney, McVeigh & Melaney, Anchorage, for appellants.

James E. Owers and Timothy A. McKeever, Faulkner, Banfield, Doogan & Holmes, Juneau, for appellee.

Before BURKE, C.J., and RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

## OPINION

CONNOR, Justice.

### Facts

The Hulls appeal from a summary judgment entered against them in superior court, allowing Alaska Federal Savings and Loan Association of Juneau [Alaska Federal] to retain the proceeds of two pledged savings accounts which served as security for a real estate transaction. At issue is whether this retention of security after a non-judicial foreclosure on the property was proper under the Alaska anti-deficiency statute (AS 34.20.100) and common law principles. We hold that the retention was proper and affirm the superior court.

In August 1975 Ronald and Jane Hull and Edward and Carole Hull [Hulls] purchased two lots in the Wasilla Airport Heights Subdivision. Alaska Federal financed the purchase of the property and the construction thereon by lending the Hulls 80% of the cost of each lot. The Hulls jointly signed two notes for $81,600 each, secured by deeds of trust on the properties.

In August of 1976, the Hulls sold the two lots to George R. Bliss for $130,000 each. Alaska Federal again financed the purchase of the property, somewhat creatively. First, the Hulls borrowed an additional $35,400 on each lot and signed a document entitled "Additional Advance Agreement" which amended the original notes to include the new loans, and expressly incorporated the terms of the original notes. This brought the Hulls' total indebtedness to $117,000 on each lot, or to 90% of the asking price. In consideration for the making of the loan, Alaska Federal required that the Hulls pledge two savings accounts, of $17,-500 each, as additional security for the loan on the property. These "Collateral Pledge Agreements" specifically provided Alaska Federal with two alternatives in case of default on the loan: (a) applying the proceeds to remedy the default; or (b) retaining the pledges to secure any deficiency after exhaustion of the real estate security. Bliss assumed the obligations of the Hulls under the promissory notes, deeds of trust and additional advance agreements by two assumption agreements. These assumption agreements provided that the Hulls were not released from their liabilities on the notes.[1]

In March of 1979, Bliss transferred the two lots to Floyd and Josephine Roberson, who assumed the remaining loan obligations. The assumption agreements released Bliss, but not the Hulls. The collateral pledge agreements were modified to reduce the amount in each account to $17,162.59.

---

1. This financing method was used because, according to Alaska Federal, Mr. Bliss apparently could or would only make a down payment of $13,000 on each property, therefore requiring financing of 90% of the purchase price. 12 C.F.R. § 545.6–1(a) (1976), in effect at the time the loan was made, limited loans by federal savings and loan associations to 80% of the value of the property. Other financing options which were not followed (for unknown reasons) included having the Hulls finance some portion of the price themselves and take a second deed of trust, or having Bliss come up with a larger down payment. Alaska Federal emphasizes that it structured the transaction in order to "accommodate" the Hulls and Bliss.

By September of 1979 the Robersons were in default on the obligation. On September 17, 1979, attorneys for Alaska Federal wrote the Hulls to inform them of the default. The letter specifically noted that under the collateral pledge agreement, if the default was not remedied within 30 days, Alaska Federal was authorized to use funds in the pledged savings account to cure the delinquency. The Hulls did not respond. On October 19, 1979, Alaska Federal began foreclosure proceedings. On October 26, 1979, the Hulls were sent written notice of the foreclosure proceedings.[2] Notice of the sale was posted on December 11, 1979, in three public places as required by statute. Notice of the pending sale was made by publication in the Palmer *Frontiersman* and the Anchorage *Daily News* on various dates in December of 1979 and January of 1980.

Hearing nothing from the Hulls, on December 19, 1979, attorneys for Alaska Federal again wrote to the Hulls, informing them again of the default and of the foreclosure proceedings. Specifically, the Hulls were warned that although Alaska Federal could apply the pledged funds against the arrearages, it could also elect to leave the accounts intact and to continue with the foreclosure of the property. The Hulls were reminded that under the collateral pledge agreement, Alaska Federal could apply the pledged funds to cover any deficiency in the sale proceeds. They also suggested that if the Hulls consented to the application of the pledged funds to the outstanding balance due on the note, Alaska Federal might be willing to terminate the foreclosure proceedings. The Hulls were urged to review the collateral pledge agreements

and to contact Alaska Federal's attorney if they had any questions or wished to object. There was no response from the Hulls.

The foreclosure sale took place on January 21, 1980. Alaska Federal bid on and bought both lots, leaving deficiencies of $17,162.59 on each lot. Each of the pledged savings accounts had a principal of $17,162.59. Alaska Federal withdrew the principals of both accounts and applied them to the deficiencies. Alaska Federal remitted to the Hulls the interest accrued on these accounts and, in a letter of January 25, 1980, notified the Hulls of its actions.

On March 18, 1980, the Hulls filed a complaint in superior court against Alaska Federal in an attempt to recover the proceeds of the pledged savings accounts. Alaska Federal answered and counterclaimed for damages for breach of the agreement. Both sides moved for summary judgment. On August 25, 1981, the superior court ordered that summary judgment be entered for Alaska Federal. This appeal followed.

### Inapplicability Of The Statute

■ AS 34.20.100 [3] states:

"*Deficiency judgment prohibited.* When a sale is made by a trustee under a deed of trust, as authorized by §§ 70—130 of this chapter, no other or further action or proceeding may be taken nor judgment entered against the maker, his surety or guarantor, on the obligation secured by the deed of trust for a deficiency."

This restriction on deficiency proceedings applies only to non-judicial foreclosure sales (sales under a deed of trust under sections 70–130), as in this case, and not to judicial foreclosure sales. *Suber v. Alaska State*

---

2. This notice of default was returned by the Postal Service as "unclaimed." However, the Hulls do not argue lack of notice, and a subsequent letter of December 19, 1979, was apparently received.

3. The Alaska anti-deficiency statute, like the post-depression enactments of many other states, was aimed at relieving the plight of debtors whose obligations were secured by mortgages or other security interests in land. Generally speaking, the devices used were postponement or stay of foreclosure sales, ex-

tension of redemption periods, grant of powers to cure defaults, abolition of or limitations on deficiency judgments. While some measures were temporary in nature, the restrictions on deficiency judgments remain a permanent part of the law in a number of states. *See* Note, *Mortgage Moratoria Legislation—Deficiency Judgments,* 8 Wash.L.Rev. 179 (1934); Poteat, *State Legislative Relief for the Mortgage Debtor During the Depression,* 5 Law & Contemp. Prob. 517 (1938).

*Bond Committee,* 414 P.2d 546, 555 (Alaska 1966).

■ The Hulls contend that this statute by its terms bars the retention of the pledged savings accounts because such retention constitutes a prohibited "further action or proceeding." Alaska Federal maintains that the retention of a bank account pledged as security does not involve a "further action or proceeding" within the meaning of the statute, and is not prohibited thereby. The superior court agreed with Alaska Federal's interpretation:

> "In so ruling, the Court interprets AS 34.20.100 as barring additional *legal* actions or court proceedings against a surety or a guarantor, for the purpose of obtaining or executing on a deficiency judgment resulting from a nonjudicial foreclosure sale of property.
>
> In this case, no such legal actions or court proceedings have been brought by defendant against plaintiffs. Nor has defendant obtained any deficiency judgment against plaintiffs, or [sic] is defendant seeking to execute on any such deficiency judgment. Rather, defendant has, pursuant to the parties' contractual agreements, applied sums in the accounts established pursuant to the two 'Collateral Pledge Agreements' to the deficiency....
>
> The Court concludes that such sums are, in essence, additional collateral committed to secure the primary debt, rather than separate assets of a guarantor being executed upon pursuant to a deficiency judgment. Accordingly, the Court concludes that AS 34.20.100 does not apply in this case, and does not bar defendant from applying sums from the accounts set up under the Collateral Pledge Agreements to the deficiency in this case."

We agree with this interpretation of AS 34.20.100.

■ "Proceedings" have been generally described as "all the steps or measures adopted in the prosecution or defense of an action." *Statter v. United States,* 66 F.2d 819, 822 (9th Cir.1933). "Action" in its "usual legal sense means a suit brought in court; a formal complaint within the jurisdiction of a court of law...." Black's Law Dictionary 26 (5th ed.1979). An " 'action' includes any matter or proceeding in a court, civil or criminal." AS 01.10.060. Therefore, the phrase "other or further action or proceeding" as used in AS 34.20.100 means a form of litigation or some type of in-court proceeding.

■ The Alaska statute limits the creditor's rights to pursue further legal action or process against his debtor for any deficiency in the obligation following a non-judicial foreclosure of the property. The limitation does not bar the retention of additional security specifically pledged on the obligation.[4]

### Estoppel

The Hulls argue alternatively that even if AS 34.20.100 is held not to apply to prevent

---

4. Under the California anti-deficiency statute, the California Supreme Court similarly held that the pursuit of additional security is not a deficiency judgment and that "the giving of additional security for the note gives the right to exhaust such security but no right to a deficiency judgment." *Freedland v. Greco,* 45 Cal.2d 462, 289 P.2d 463, 465 (1955). This distinction has been followed by later courts. *In re Forester,* 529 F.2d 310, 316 (9th Cir.1976) ("A mortgagee may pursue additional security given by the mortgagor if the primary security is insufficient to satisfy the obligation."); *Redingler v. Imperial Sav. & Loan Ass'n of the North,* 47 Cal.App.3d 48, 120 Cal.Rptr. 575, 576 (1975).

The California Code of Civil Procedure § 580d reads in pertinent part:

> "No judgment shall be rendered for any deficiency upon a note secured by a deed of trust or mortgage upon real property hereafter executed in any case in which the real property had been sold by the mortgagee or trustee under power of sale contained in such mortgage or deed of trust."

The Hulls argue that the Alaska statute is written more expansively, and is not only designed to prohibit a deficiency judgment in the strict sense (*i.e.,* a personal judgment against the debtor) but also any aggravation of the debtor's plight by any further action including retention of pledged security. While we agree that a broader interpretation may be necessary in other contexts, we cannot read the words "other actions or proceedings" so broadly as to include the retention of additional pledged security.

Alaska Federal's retention of the savings accounts, since the election of non-judicial foreclosure irreparably prejudiced the rights to recover from subsequent owners of the land, Alaska Federal should be estopped from retaining the pledged savings accounts under common law principles of suretyship. The Hulls claim that the reasoning employed in *Union Bank v. Gradsky,* 265 Cal.App.2d 40, 71 Cal.Rptr. 64 (1968),[5] can be applied readily to the present case. They argue that the Robersons, by assuming the obligations on the property, became the principal obligors, leaving the Hulls secondarily liable as sureties. Because the Hulls have satisfied part of the obligation out of the savings accounts proceeds, they should, under this line of reasoning, be subrogated to the rights of Alaska Federal against the Robersons. Alaska Federal, however, has no rights against the Robersons, because it chose to hold a non-judicial foreclosure sale and the Robersons are, therefore, protected by AS 34.20.100. Since Alaska Federal's election of remedies has destroyed the Hulls' subrogation rights, the Hulls argue that it is equitable to have the ultimate impact of the loss fall upon Alaska Federal.

Under the common law requirement that a creditor act with good faith toward a surety, a surety can be discharged when his rights are impaired through actions of the creditor. Cases have held that a surety is discharged where the creditor releases se-curity which he holds for the debt, where the creditor fails to do what is necessary in order to make the security available (such as neglecting to file a mortgage for record and having other liens intervene), or where the creditor releases a levy of execution which had been placed on the property. A. Stearns, The Law of Suretyship, § 11.13 at 470–71 (1973).

■ We agree that Alaska Federal's election to non-judicially foreclose prejudiced the Hulls' subrogation rights, but we need not decide whether this action constituted a breach of trust remediable in equity, because we find that the Hulls are estopped from asserting their subrogation rights by their previous conduct with regard to the non-judicial foreclosure.

Estoppel is "the assertion of a position by conduct or word, reasonable reliance thereon by another party, and resulting prejudice." *Jamison v. Consolidated Utilities, Inc.,* 576 P.2d 97, 102 (Alaska 1978). In the instant case, the Hulls were given full notice that the obligation was in default. The first letter merely reminded them that if it was not remedied in 30 days, the savings accounts could be used to cure the delinquency. The second letter gave them written notice that a non-judicial foreclosure was proceeding. There was also notice of the pending sale by posting and by publication. The final letter before the sale repeated the previous information and specifi-

---

**5.** In *Gradsky,* the homeowner borrowed money from the bank which was secured by a deed of trust on the property. The contractor executed a written guaranty of the obligation. When the homeowner defaulted, the bank elected to foreclose non-judicially and bid on and bought the property. The amount left unpaid was approximately $11,500, and the bank sued the contractor for this amount. While California Code of Civil Procedure § 580d did not apply directly, the California court held that the bank's recovery against the contractor was barred by the principle of estoppel.

"Section 580d itself does not supply the answer, but it is an integral part of the answer which must be given. Because of section 580d neither the Bank nor the guarantor can recover a personal judgment from the debtor after a non-judicial sale of the security. The creditor, and the creditor alone, has the option of preserving its own and the surety's rights by way of subrogation to realize a personal judgment against the debtor. The creditor has a duty to the surety not to impair the surety's remedies against the principal debtor. (Cf. Civ.Code, §§ 2810, 2819.) Upon the Bank's electing to pursue a remedy which destroys both the security and the possibility of the surety's reimbursement from the principal debtor, the creditor is thereafter estopped from pursuing the guarantor for a deficiency following a nonjudicial sale of the security. The result follows not because section 580d of the Code of Civil Procedure prevents recovery of a deficiency judgment against the guarantor, but because the section prevents a deficiency judgment by the guarantor against the debtor." (footnote omitted).

71 Cal.Rptr. at 69.

cally reminded them that under the collateral pledge agreement the foreclosure could go ahead and the savings accounts could be applied to cure any deficiencies. Alaska Federal also indicated that if the Hulls consented to application of the proceeds to the balance due, the foreclosure might be terminated.

The Hulls' response to these repeated contacts and inquiries by the bank was absolute silence and total inaction. Implicit in their failure to object is an acquiescence to the non-judicial foreclosure. The Hulls had adequate notice of the imminent loss of their subrogation rights without a specific warning from Alaska Federal that non-judicial foreclosure coupled with the application of the anti-deficiency statute to the Robersons would result in such a loss. To let the Hulls now object to the non-judicial foreclosure and the loss of their subrogation rights would prejudice Alaska Federal because of its reliance on the Hulls' inaction.[6]

The Hulls argue, in defense of their inaction, that once they received notice of the foreclosure there was little that they could do. This is not true. They could have paid the arrearages and the foreclosure sale would have been halted. AS 34.20.070. They could have bought the loan from Alaska Federal, or attempted refinancing. They might have requested that the bank foreclose judicially. Had the Hulls made a legitimate attempt to contact Alaska Federal and register an objection to the non-judicial foreclosure, Alaska Federal could not have reasonably relied on their failure to object.

Therefore, the trial court was correct in permitting Alaska Federal to retain the pledged savings accounts. The summary judgment order of the superior court is AFFIRMED.

6. A similar case is *Mariners Sav. & Loan Ass'n v. Neil*, 22 Cal.App.3d 232, 99 Cal.Rptr. 238 (1971). In that case the lender was not estopped from collecting from the guarantor of an obligation even though the lender's non-judicial sale of the security had destroyed the guarantor's subrogation rights. Because the guarantor had ample notice of the sale and could have preserved all of his rights by acquiring the note and the trust deed, he could not claim that the lender was estopped from collecting from him. "He manifested a complete disinterest in any right of subrogation" by his conduct. 99 Cal.Rptr. at 241.