FIREMAN'S FUND MORTGAGE COR-
PORATION (as agent for Alaska Hous-
ing Finance Corporation), Appellant,

v.

ALLSTATE INSURANCE COMPANY;
First National Bank of Anchorage, and
Gary Severance, Personal Representa-
tive of the Estate of Marjorie Severance
Hoover, Appellees.

No. S–4298.

Supreme Court of Alaska.

Sept. 11, 1992.

Richard N. Ullstrom, Routh, Crabtree & Harbour, Anchorage, for appellant.

Ronald E. Noel, and Joseph S. Slusser, Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

In this interpleader action, Fireman's Fund Mortgage Corporation (Fireman's Fund) and First National Bank of Anchorage (First National) each claim $28,175 which was interpled by Allstate Insurance Company.[1] The sum represents Allstate's obligation under a fire insurance policy which it issued to cover the Fairbanks property involved in this case. Fireman's Fund held a first deed of trust on the fire-damaged property, and First National held a second deed of trust. On cross-motions for summary judgment, the superior court granted First National's motion and awarded it the amount interpled plus interest. We reverse.

## I. FACTS & PROCEEDINGS

Fireman's Fund administered a deed of trust for Alaska Housing Finance Corporation (AHFC) on property located in Fairbanks. First National held a second deed of trust on the property securing a loan in the amount of $147,000. At all relevant times, the title owner of the property was Marjorie Severance–Hoover.

Due to a default on the loan secured by its first deed of trust, Fireman's Fund began non-judicial foreclosure proceedings by recording a Notice of Default in April 1989. A foreclosure sale occurred on August 3, 1989. At the time of the sale, the principal owing on the Fireman's Fund loan was $93,996.56 (not including accrued interest and foreclosure fees). Fireman's Fund bought the property on behalf of AHFC with an offset bid of $75,486.15. Several days later, Fireman's Fund discovered for the first time that the house on the property had been virtually destroyed by fire just a few hours before the start of the sale.[2]

The trust deeds required Ms. Severance to maintain fire insurance on the property for its "full insurable value." Two fire insurance policies covered the property at the time of the fire: one issued by Allstate

1. In this appeal, Fireman's Fund is acting as agent for Alaska Housing Finance Corporation who was beneficiary of a first deed of trust on the property in question. However, for ease of reference, we have adopted the convention of the parties and refer to Fireman's Fund as if it were the real party in interest.

2. First National concedes Fireman's Fund's lack of knowledge at the time of sale only for the purpose of its summary judgment motion because it believes this fact is irrelevant to the legal question presented. If this turns out not to be the case, First National requests a hearing to determine Fireman's Fund's actual knowledge. The general rule is that:

a party moving for summary judgment concedes the absence of a factual issue and the truth of the nonmoving party's allegations only for purposes of his own motion. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 at 20 (1983). Therefore, as a strictly procedural matter, First National has not waived its right to contest this issue. However, the undisputed facts disclosed in the record appear capable of supporting only one conclusion; that Fireman's Fund made its offset bid with no knowledge of the fire.

and another issued by American Bankers Insurance (ABI). Both policies named Fireman's Fund as mortgagee. The Allstate policy contained a "standard" or "union" mortgagee clause which provided that the policy would "not be invalidated ... by the commencement of foreclosure proceedings ... by virtue of any mortgage or deed of trust." It further provided:

> Should legal title to and beneficial ownership of any of the property covered under this policy become vested in the Lender ... insurance under this policy shall continue for the term thereof for the benefit of the Lender....

First National was not named as a loss payee in either policy. However, Allstate has admitted, and Fireman's Fund does not contest, that First National has a lender's interest in the subject property making it a loss payee under the policy.

After the fire, the two insurers ordered an appraisal of the property. The appraiser determined that the market value of the property in its undamaged state was $86,-000. The appraiser then estimated that the fire had reduced the property's value by $58,000 and placed its post-fire market value at $28,000 for land and undamaged site improvements.

Based on this appraisal, the two insurers pro-rated their liability under the policies. American Bankers Insurance paid its pro-rated share directly to Fireman's Fund. Allstate initially tendered a check for $28,-175.00 payable jointly to Ms. Severance and Fireman's Fund as full settlement for its pro-rated share. However in December 1989, after the Severance estate[3] and First National made competing claims to the insurance proceeds, Allstate stopped payment on the check and filed this interpleader action.

In February 1990, Allstate deposited the $28,175 with the clerk of the court. First National moved for summary judgment seeking not only the amount interpled by Allstate but a sum representing the entire amount of the loss. After a cross-motion for summary judgment by Fireman's Fund, the superior court granted First National's motion and awarded it the interpled funds plus interest. The trial judge only offered two citations without text or explanation to support his decision: *Bohn v. Louisiana Farm Bureau Mutual Ins. Co.,* 482 So.2d 843, 851 (La.App.1986) and *Stormont v. Weatherby,* 4FA–86–01771 Civ. (Alaska Super., 4th Dist., Fairbanks, April 20, 1987) (Decision of Superior Court Judge Jay Hodges). This appeal followed.

## II. DISCUSSION

■ The question presented in this case is one of first impression for this court.[4] First National apparently persuaded the trial judge below that Fireman's Fund's decision to non-judicially foreclose on the Fairbanks property divested it of the right to collect the insurance proceeds.[5] On appeal, Fireman's Fund argues that it is entitled to *all* of the insurance proceeds because the unpaid debt on its first deed of trust was not fully discharged by fore-

---

**3.** Ms. Severance–Hoover died during the pendency of this action and her estate is being represented by Gary Severance. However, after initially filing an answer to the interpleader complaint, the estate has taken no further record action in the case and has not appealed the trial court's decision.

**4.** Since the parties do not dispute the facts for purposes of their summary judgment motions, a question of law is presented. We review a question of law using our independent judgment and adopt the rule which is most persuasive in light of precedent, reason and policy. *Guin v. Ha,* 591 P.2d 1281 (Alaska 1979).

**5.** Under state law, a mortgagee has limited options when a mortgagor defaults on a loan, and, as First National points out, each option has its own advantages and disadvantages. A mortgagee may 1) sue on the note itself, 2) judicially foreclose on the property and preserve the right to a deficiency judgment subject to a mortgagor's right of redemption, or 3) nonjudicially foreclose on the property and give up any deficiency judgment but also avoid redemption rights and court costs. *See Moening v. Alaska Mutual Bank,* 751 P.2d 5, 7–8 (Alaska 1988). First National maintains, based on its reading of the relevant statute, that by choosing the last option, Fireman's Fund's debt was extinguished at the time of the foreclosure sale because it had fully satisfied its debt as a matter of law. Therefore, First National concludes, Fireman's Fund's right to the insurance proceeds was also extinguished.

closure. Fireman's Fund contends that its offset bid should not be deemed a satisfaction of its debt divesting it of the right to collect the insurance proceeds because the bid reflects the property's value in its undamaged state. It maintains that, as senior lienholder, the company is entitled to fully satisfy its debt out of the insurance proceeds before a junior lienholder may receive anything. It also maintains that the insurance claims adjustment process will guard against a first mortgagee receiving more than its due. We agree with Fireman's Fund's first contention regarding discharge by foreclosure. We will address its second contention concerning the effect of the offset bid in the next section.

1. *Alaska Statute 34.20.100 does not operate to extinguish a secured debt upon foreclosure as a matter of law.*

[redacted] As a preliminary matter, we note that the authority cited by the trial judge may be distinguished on the facts and therefore fails to support the court's decision. In *Stormont,* the superior court held that a non-judicial foreclosure sale subsequent to a fire loss extinguishes the underlying mortgage and therefore divests the mortgagee of the right to collect insurance proceeds. *Stormont,* slip op. at 3. However, this holding was explicitly based on the fact that the mortgagee had bid the full amount due on the mortgage at the foreclosure sale. The trial judge observed: "since [the mortgagee] has been *paid in full,* he is not entitled to the insurance proceeds." *Id.* (emphasis added).

In *Bohn,* a mortgagee, who was named as loss payee under a "standard" mortgagee clause, sought fire insurance proceeds for a fire damaged property which it purchased at its own foreclosure sale subsequent to the fire's occurrence. *Bohn,* 482 So.2d at 844–46. The mortgagor sought the same proceeds. *Id.* The *Bohn* court first noted that Louisiana's antideficiency statute provides that if a mortgagee elects to satisfy its debt through a foreclosure sale without the benefit of an appraisal and the sale proceeds are insufficient to satisfy the debt, "the debt nevertheless shall stand fully satisfied and discharged in so far as it constitutes a personal obligation of the debtor." La.Rev.Stat.Ann. § 13:4106; *Id.* at 848. The court then reasoned that:

> the mortgagee has a vested interest in the [insurance] proceeds as of the time of loss. However, when the mortgagee forecloses on the debtor's property without benefit of appraisal, *the debt is extinguished insofar as it exists as a personal obligation of the debtor under the Deficiency Judgment Act. Therefore, the mortgagee's interest in the proceeds, which is the balance of the mortgage debt, is likewise reduced to zero.* At that point, the entire fund representing the insurance proceeds is the property of the insured. Thus, an action by the mortgagee for recovery of the insurance proceeds subsequent to a foreclosure without benefit of appraisal is an action against property of the mortgage debtor, and is consequently precluded by the Deficiency Judgment Act.

*Id.* at 851 (emphasis added).

The holding in *Bohn* supports the proposition that a mortgagor may, under Louisiana's antideficiency act, recover fire insurance proceeds if a mortgagee forecloses without appraisal subsequent to a fire loss. However, both the language of Louisiana's statute and the rationale of the *Bohn* opinion indicate that a second mortgagee may not simply step into the mortgagor's shoes and recover the proceeds following a foreclosure by the first mortgagee. In other words, it does not follow that a second mortgagee is afforded the same statutory protections as the mortgagor, nor does it follow that a first mortgagee's interest in the insurance proceeds is extinguished as to all claimants.[6]

Furthermore, Fireman's Fund persuasively argues that Alaska's antideficiency statute, AS 34.20.100, is fundamentally different than Louisiana's statute in that it does not operate to extinguish the underlying debt but merely eliminates certain

6. In addition to factual differences in these cases, we are, of course, free to adopt our own rule even if contrary to the reasoning employed by these persuasive authorities.

types of remedies against specific classes of debtors.[7] AS 34.20.100 (1990) provides:

When a sale is made by a trustee under a deed of trust, as authorized by AS 34.20.-070–34.20.130 [statutes governing non-judicial foreclosure sales], no other or further action or proceeding may be taken nor judgment entered against the maker or the surety or guarantor of the maker, on the obligation secured by the deed of trust for a deficiency.

In *Hull v. Alaska Federal Sav. & Loan Ass'n*, 658 P.2d 122 (Alaska 1983), we held that although the antideficiency statute:

limits the creditor's rights to pursue further legal action or process against his debtor for any deficiency in the obligation following a non-judicial foreclosure of the property[, t]he limitation does not bar the retention of additional security pledged on the obligation.

*Id.* at 125. While we recognize that *Hull* is not precisely on point because fire insurance proceeds are generally considered substitute security rather than additional security, the case supports Fireman's Fund's view that a non-judicial foreclosure sale does not operate to extinguish the underlying debt.

It is also significant that the competing claimants in the present case are first and second mortgagees rather than a mortgagor and a mortgagee as in *Hull.*

■ In *Hull,* we stated that the "Alaska anti-deficiency statute, like the post-depression enactments of many other states, *was aimed at relieving the plight of debtors whose obligations were secured by mortgages or other security interests in land."* *Id.* at 124 n. 3 (emphasis added). The protections of this statute are aimed at the mortgagor and may not be invoked by a junior lienor who knowingly took a lesser security interest. We have stated that "[t]he effect of the trustee's sale was to *discharge all [the mortgagor's] obligations under the note."* *Smith v. Shortall,* 732 P.2d 548, 549 (Alaska 1987). However, the fact that the *mortgagor's obligation* is discharged does not mean that the underlying debt is extinguished for all purposes.

Finally, the statute's plain language supports the conclusion that the loan obligation is not completely extinguished as a matter of law at the time of a non-judicial foreclosure sale. The statute contemplates the survival of a loan "obligation" following the sale, but precludes the lender from seeking any "deficiency" on this obligation either from the debtor or from the debtor's guarantor.

## 2. *Fireman's Fund is bound by its offset bid but may seek reformation of the sales contract given the equities of this case.*

■ Fireman's Fund was protected by a "standard" mortgagee clause in the two fire insurance policies. A standard mortgagee clause in an insurance contract provides a mortgagee with much greater protection than a "simple" loss payee clause which merely designates the mortgagee as an alternative payee under the policy. Under a standard mortgagee clause, a mortgagor's breach of the insurance contract will not bar recovery by the mortgagee. *Bohn,* 482 So.2d at 850 (quoting Couch on Insurance Law § 42:694 (2d ed. 1963)). The standard clause constitutes a separate and independent contract between the mortgagee and the insurance company which is "measured by the terms of the mortgage clause itself."[8] *Id.*

7. All the cases cited by First National involve anti-deficiency statutes more akin to Louisiana's act than to AS 34.20.100. *See e.g. Moke Realty v. Whitestone Sav. & Loan Ass'n,* 82 Misc.2d 396, 370 N.Y.S.2d 377, 380 (N.Y.Sup.1975) (result similar to *Bohn;* N.Y. antideficiency statute provides that failure to move for deficiency judgment within 90 days of foreclosure sale and delivery of deed means "the proceeds of the sale regardless of amount shall be deemed to be in full satisfaction of the mortgage debt").

8. Fireman's Fund relies on this premise to argue that its reasonable expectations of coverage will be defeated if its foreclosure bid divests it of the right to collect the proceeds. The clause itself specifically states that the policy will not be invalidated as to the lender payee as a result of any foreclosure and also contemplates that legal title may vest in the lender without causing an interruption in coverage. It is well recognized that the right to insurance proceeds vests at the time of loss. *See Atlas Assurance Co. v. Mistic,*

■ Fireman's Fund acknowledges that most courts have held that a subsequent foreclosure by a mortgagee either partially or completely divests the mortgagee of its rights under the insurance contract.[9] *See Whitestone Sav. & Loan Ass'n v. Allstate Ins. Co.*, 28 N.Y.2d 332, 321 N.Y.S.2d 862, 270 N.E.2d 694 (N.Y.App.1971); *Moke v. Whitestone Sav. & Loan Ass'n*, 82 Misc.2d 396, 370 N.Y.S.2d 377 (N.Y.Sup.1975); *see generally* 5A John A. Appleman & Jean Appleman, Insurance Law & Practice § 3403–04 at 299 (1990). However, Fireman's Fund points out that the courts that espouse this rule are primarily concerned with unjust enrichment and assume that the mortgagee knowingly and voluntarily elected to seek the property in lieu of the proceeds or made an offset bid on the property aware of its damaged condition. The rule is therefore:

> intended to prevent a creditor from receiving a double payment. The creditor's interest in the insurance proceeds is recognized as security for the payment of the debt. The insurance is an alternative source of payment and once the debt is paid by some other means any right to the insurance is thereby extinguished.

*Calvert Fire Ins. Co. v. Environs Development Corp.*, 601 F.2d 851, 856 (5th Cir. 1979).

Although not specifically discussing "standard" mortgagee clauses or the effect of subsequent foreclosure, we have made a similar observation in *Moran v. Kenai Towing & Salvage, Inc.*, 523 P.2d 1237, 1239–40 (Alaska 1974):

> The great weight of authority answers that a mortgagee may satisfy his secured debt from the proceeds [of the fire insurance policy], but if the indebtedness does not exhaust the proceeds, the balance shall be paid to the mortgagor. Were the rule otherwise, the mortgagee would be unjustly enriched at the expense of the mortgagor, who bears the ultimate burden of paying for the insurance. The purpose of requiring insurance coverage ... is to protect the integrity of the asset which is hypothecated to the mortgagee to secure repayment of the underlying debt.

*Moran*, 523 P.2d at 1239–40. Clearly, the rationale behind these cases is the desire to prevent a double recovery. Thus Fireman's Fund is prohibited, under the rationale in *Moran*, from receiving more insurance proceeds than required to satisfy its outstanding debt.

■ The next issue which must be resolved is the amount of Fireman's Fund's outstanding debt following the foreclosure

---

822 P.2d 897, 903 (Alaska 1991); *see also Corbin v. Aetna Life & Cas. Co.* 447 F.Supp. 646, 650 (N.D.Ga.1978) (citing and quoting 5a John A. Appleman & Jean Appleman, Insurance Law and Practice, § 3403 at 300 (rev'd ed. 1970)). Therefore some courts have held that a subsequent foreclosure will not affect a mortgagee's rights to the insurance proceeds at least when the controversy involves an insurer and a mortgagee/claimant. *See Corbin*, 447 F.Supp. at 651–52.

However, in the present case, Allstate acknowledges its obligation under the contract and the dispute is between competing claimants to the proceeds. It is the equitable relationship between the parties that is at issue not an interpretation of the contract provisions. *See Moran v. Kenai Towing and Salvage, Inc.* 523 P.2d 1237, 1240 n. 2 (Alaska 1974) (in a dispute involving a mortgagor and a mortgagee's competing claims to insurance proceeds, we concluded that the statute governing insurance contracts was not directly relevant; instead we fo-

cused on the equitable relationship between the parties). Therefore, Fireman's Fund's argument on this point has little merit.

9. The courts are split on whether a mortgagee's offset bid for less than the amount of its outstanding debt operates to completely extinguish the debt or merely reduces the mortgagee's insurable interest in the property and by extension reduces its entitlement to the insurance proceeds. Some, like the *Bohn* court, rely on their antideficiency statute to conclude that even a partial bid completely extinguishes the debt. *See e.g. Coppotelli v. Insurance Co. of North America*, 484 F.Supp. 1327, 1329 (E.D.N.Y.1980). Others follow the rule that "subsequent partial or full extinguishment of the debt giving rise to the insurable interest will reduce the loss-payee's interest in the proceeds to the extent the debt has been satisfied." *See Calvert Fire Ins. Co. v. Environs Development Corp.* 601 F.2d 851, 856 (5th Cir.1979) (providing extensive list of case citations as support for rule).

sale.[10] Fireman's Fund argues that we should disregard its offset bid because the bid was made in ignorance of the property's damaged condition. Fireman's Fund points out that the appraised value of the fire-damaged property ($28,000.00), the ABI insurance proceeds ($33,564.10) and Allstate proceeds ($28,175.00) combined come to several thousand dollars less than the mortgage indebtedness of $93,996.56 which remained on the first deed of trust. Therefore, Fireman's Fund argues that, in real terms, it is not getting more than its due.

We recognize the validity of Fireman's Fund's economic argument and have some reservations about holding it to an offset bid made in ignorance of the property's condition merely to preserve what is essentially a legal fiction (i.e. that the offset bid represents a mortgagee's actual payment for the property).[11] However, we believe it would be a mistake to simply disregard the offset bid in this situation, as Fireman's Fund urges us to do. If a mortgagee's offset bid is not really an offset of the outstanding debt, how can the remaining indebtedness be determined for purposes of pursuing additional security, as in *Hull*? *See Hull*, 658 P.2d at 122.

Fireman's Fund had a contractual right to the insurance proceeds which vested at the time of the fire. *See Atlas Assurance Co. v. Mistic*, 822 P.2d 897, 903 (Alaska 1991); *see also Corbin v. Aetna Life & Cas. Co.* 447 F.Supp. 646, 650 (N.D.Ga. 1978). The subsequent foreclosure did not change this contractual right. However, at the foreclosure sale a few hours later, Fireman's Fund essentially "spent" $75,486.15 of its total indebtedness in making its offset bid. This offset bid left Fireman's Fund with an outstanding indebtedness of approximately $18,500 plus interest and

---

**10.** The North Carolina Court of Appeals lays out the approach typically taken by courts to resolve this type of dispute:

> [C]ourts emphasize the sequence of events. They distinguish between foreclosure-after-loss and foreclosure-before-loss. When insured property is damaged *prior* to foreclosure, courts allow the purchasing mortgagee to retain under the mortgage clause those proceeds amounting to any deficiency after foreclosure. The mortgagor recovers the remainder of the proceeds. The courts conclude that once the deficiency is satisfied, the mortgagee's additional recovery of proceeds representing undamaged property would amount to unjust enrichment since its bid represented the value of *damaged* property.
>
> Where the damage occurs *after* approval of the foreclosure sale and before expiration of the mortgagor's right to redeem, courts have allowed the purchasing mortgagee to recover *all* the insurance proceeds should the mortgagor fail to redeem within the time period. The courts point out that the mortgagee's bid represented the property in an undamaged state. The mortgagee is thus "entitled to what remains in the money which stands in place of the lost portion of the property which he purchased."

*Tech Land Dev. v. South Carolina Ins.*, 57 N.C.App. 566, 291 S.E.2d 821, 823–24 (1982) (quoting *Malvaney v. Yager*, 101 Mont. 331, 54 P.2d 135, 139 (1936) (citations omitted, emphasis in original). Here, the fire occurred only hours before the sale, and Fireman's Fund had no actual or constructive notice of the damage. These unusual facts make a straightforward application of the traditional rule problematic.

**11.** Courts have gone both ways on this question based on their view of the effect of foreclosure and the particular facts presented. The Ninth Circuit took a strictly technical approach in *Universal Mortgage Co. v. Prudential Ins. Co.*, 799 F.2d 458 (9th Cir.1986). Applying California law, the circuit court noted that a "full or partial extinguishment of a mortgage debt, whether prior or subsequent to loss, precludes, to the extent thereof, any recovery on a loss by the loss payable mortgagee." *Id.* at 460. The circuit court then adopted the district court's explanation that:

> actual or constructive knowledge [of the property's condition] is irrelevant to the policy or application of the rule. Neither the true value of the subject property nor the conduct of the beneficiary controls the impact of a full credit bid. Once the debt was extinguished at the time of the bid, so was [mortgagee's] insurable interest.

*Id.* (quoting the district court). The Connecticut Supreme Court takes an approach more reflective of economic reality. *See Burritt Mut. Sav. Bank v. Transamerica Ins.*, 180 Conn. 71, 428 A.2d 333 (1980). The court first recognized that "inequitable results may be produced if a court regards the debt as wholly satisfied when the mortgagee has in fact received less than full payment." *Id.* at 338 (quoting Keeton, Basic Text on Insurance Law 188, n. 4 (1971)). Since the record failed to disclose the actual value of the damaged property at the time the mortgagee acquired the deed through strict foreclosure, the court remanded the case for a determination whether "the appropriation by strict foreclosure of the mortgaged property has equitably satisfied the mortgage debt." *Id.* 428 A.2d at 339.

foreclosure costs. Under *Moran* and the great weight of authority, Fireman's Fund is only entitled to recover an amount of the insurance proceeds sufficient to satisfy this outstanding debt. Any remaining proceeds must be passed on to junior lienholders and/or the mortgagor as their interests appear.

Nonetheless, our holding today does not mean that Fireman's Fund is left without legal recourse to avoid this result. Given the facts of this case,[12] it would be plainly unjust to leave Fireman's Fund with a fire-damaged property and yet deprive it of the insurance proceeds "which stands in place of the lost portion of the property." *See Tech Land Dev. v. South Carolina Ins.*, 57 N.C.App. 566, 291 S.E.2d 821, 823–24 (1982) (quoting *Malvaney v. Yager*, 101 Mont. 331, 54 P.2d 135, 139 (1936) (citations omitted)).

■■■ The best solution is to allow Fireman's Fund to seek reformation of the foreclosure sales contract to replace the $75,486.15 purchase price with a price more reflective of the actual market value of the property at the time of sale. Traditionally, reformation is a tool courts use to correct what are essentially errors in the drafting of a contract so as to conform the written agreement to the "clear intention of the parties." *See Oaksmith v. Brusich*, 774 P.2d 191, 197 (Alaska 1989). We have also held that "[r]eformation is appropriate where, by reason of mutual mistake, the written agreement does not accurately reflect the bargain intended by the parties." *Riley v. Northern Commercial Co., Mach. Div.*, 648 P.2d 961, 969 (Alaska 1982).

■■■ However, we have also recognized a more expansive use of the tool of reformation to allow our courts to alter the terms of a contract when the interests of justice so require. In *Vockner v. Erickson*, 712 P.2d 379 (Alaska 1986), we upheld a superior court's reformation of a land sales contract based on the finding of unconscionability. *Id.* at 383. We noted that "the aim of reformation in these circumstances is to bring the contract in conformity with minimal standards of conscionability." *Id.* at 384.

The present case falls somewhere between the traditional use of reformation and its more expansive use based on an examination of the equities involved. On the one hand, all parties to the foreclosure sale were operating under the belief that the subject property was undamaged at the time of sale. Fireman's Fund's bid was therefore based on a mutual mistake as to the condition of the property. Fireman's Fund was bargaining for an undamaged property and did not obtain the benefit of its bargain. Reformation of the sales price is therefore appropriate. Also, from an equity standpoint, it is significant that this was a foreclosure sale in which the mortgagee operating the sale purchased the foreclosed property. Fireman's Fund was, in essence, both the buyer and seller in the transaction.

The somewhat unusual features of this case make reformation a sensible remedy. We therefore conclude that Fireman's Fund may seek reformation upon remand of this case to the superior court. Even so, Fireman's Fund has the burden of showing by clear and convincing evidence that reformation is warranted. *See Oaksmith*, 774 P.2d at 197. At this proceeding, all interested parties should be allowed to present evidence as to Fireman's Fund's knowledge of the condition of the property at the time of sale and any other related matters.

III. CONCLUSION

On the undisputed facts presented, we hold that Fireman's Fund is not precluded by AS 34.20.100 (1990) from satisfying its outstanding debt from available insurance proceeds even though it purchased the fire-damaged property at its own foreclosure

---

12. The operative facts are that Fireman's Fund initiated non-judicial foreclosure proceedings before the fire occurred and had no actual or constructive knowledge of the property damage at the time it made its offset bid. The very short period of time between the fire and the foreclosure sale goes to the issue of constructive knowledge and obviously weighs in Fireman's Fund's favor. If there were other bidders at the foreclosure who were outbid by Fireman's Fund's use of its offset bid rights, the equities might be balanced differently.

sale. However, Fireman's Fund must be held to its offset bid of $75,486.15 which would entitle it to only so much of the insurance proceeds as required to pay off the remaining debt, approximately $18,500 plus interest and foreclosure costs. The remaining proceeds should go to First National and/or the Severance estate as their interests appear.[13] We further hold that Fireman's Fund is entitled to seek reformation of the purchase price in the sales contract.

REVERSED and REMANDED for further proceedings consistent with this opinion.

**13.** Fireman's Fund has raised an alternative basis for reversal of the trial court's decision. Under Alaska's deed of trust statutes, if a senior lienholder provides notice of a pending nonjudicial foreclosure sale to junior lienholders, the sale extinguishes the junior lienholders' interest. AS 34.20.090(a)–(c); *See Nystrom v. Buckhorn Homes, Inc.,* 778 P.2d 1115, 1124–25 (Alaska 1989). One fact, which the record does not reveal, is whether First National had notice of the sale. Assuming it did, First National's failure to protect its interest before the sale would eliminate its insurable interest in the property had the fire taken place after the sale. However, because the fire occurred prior to the sale, First National retains a secondary interest in the fire insurance proceeds. *See supra,* p. 797 (rights to fire insurance proceeds vest at time of fire).