482 So.2d 843 (1986)
J. Mack BOHN and Sheila Bohn, Plaintiffs-Appellees,
v.
LOUISIANA FARM BUREAU MUTUAL INSURANCE COMPANY, Defendant-Appellant, and
Bank of Morehouse, Intervenor-Appellee.
No. 17380-CA.
Court of Appeal of Louisiana, Second Circuit.
January 22, 1986.
Rehearing Denied February 20, 1986.
*844 Bruscato, Loomis & Street by Anthony J. Bruscato, Monroe, for plaintiffs-appellees J. Mack Bohn and Sheila Bohn.
Porteous, Hainkel, Johnson & Sarpy by Michael K. Fitzpatrick and Peter M. Meisner, New Orleans, for defendant-appellant Louisiana Farm Mut. Ins. Co.
Rankin, Yeldell, Herring & Katz by Stephen J. Katz, Bastrop, for intervenor-appellee Bank of Morehouse.
Before JASPER E. JONES, SEXTON and LINDSAY, JJ.
SEXTON, Judge.
In this action to recover proceeds from a fire and extended coverage insurance policy, plaintiffs, J. Mack Bohn and Sheila Bohn, appeal from a trial court judgment awarding judgment against Louisiana Farm Bureau and in favor of plaintiffs for $35,000 for contents loss, along with penalties and attorney's fees. The judgment also awarded intervenor, Bank of Morehouse, the mortgagee of the damaged property, $30,000 for damage to the residential structure, plus interest and attorney's fees. Additionally, the judgment recognized the privilege for attorney's fees pursuant to a contract of employment between plaintiffs and their attorney on all amounts awarded except the award in favor of the Bank of Morehouse, with penalties and attorney's fees. Louisiana Farm Bureau has also appealed. Intervenor, Bank of Morehouse, has answered the appeals of plaintiffs and defendant seeking an increase in attorney's fees.
Both the facts and the procedural history involved in this complicated and protracted litigation must be set forth in cumbersome detail.
On January 24, 1981, Danny Ray Gentry and Paula Janice Gentry granted a lease on their residence in Bastrop, Louisiana to J. Mack Bohn and Sheila W. Bohn. The lease agreement contained an option to purchase clause wherein it was provided that the tenant was given the option to purchase the property for the sum of $46,229.73 cash. Furthermore, the lease agreement provided that the tenant agreed to provide insurance on the property to protect against destruction by fire, wind storm or other casualty up to the full insurable value of the property. It was also agreed in the lease that the fire insurance policy would name the landlord as the owner thereof. This document was recorded.
Also on January 24, 1981, the parties to the lease agreement executed a counter letter which purported to transfer the interest of Danny Ray Gentry and Paula Janice Gentry in the subject property to J. Mack Bohn and Sheila Weir Bohn. This document reflects that no assumption deed was executed at the request of J. Mack Bohn and Sheila Weir Bohn. Instead, a lease with option to purchase was executed in an attempt by J. Mack Bohn and Sheila Weir Bohn to circumvent the requirements of Bastrop Federal Savings and Loan Association *845 with regard to the assumption and approval of the prospective vendee by the Savings and Loan Association. The testimony reflects that the parties agreed that the Bohns would pay a monthly note to the Gentrys, who would in turn, pay the mortgage indebtedness to Bastrop Federal.
On June 1, 1982, J. Mack Bohn procured the instant insurance policy, with limits of liability of $70,000 for structural damages, $7,000 for damage to any appurtenant structures, $35,000 for loss of unscheduled personal property, and $14,000 in additional living expenses. Listed on the policy as first mortgagee is Bastrop Federal Savings, which at the time of the transfer held two mortgages on the property, the first mortgage in the amount of $36,800, and the second in the amount of $12,000.
On November 9, 1982, fire damaged the plaintiff's residence. The fire investigative report indicated that a five gallon galvanized gas can was found inside the residence in the dining room area near the kitchen table. A small amount of gasoline was found in the can. The report also indicated that the entrance door in the carport had a window pane in the lower left corner broken out. The glass fragment pattern indicated that the window pane was broken inward.
Plaintiffs instituted this action on February 28, 1983 to recover the proceeds from the fire and extended coverage insurance policy plus penalties and attorney's fees from their insurer, Louisiana Farm Bureau Mutual Insurance Company. The defendant, Louisiana Farm Bureau, answered plaintiffs' petition affirmatively alleging that plaintiff's claim should be barred because the fire was of incendiary origin, and because the plaintiffs were guilty of fraud in that plaintiffs had attempted to deceive defendants as to the cause of the fire and the value of property claimed to be damaged. Subsequently, Bastrop Federal Savings and Loan Association intervened in this action alleging that it was the holder of the first and second mortgages on the property, was named as loss payee in the insurance policy and was, as a consequence, entitled to be paid for damages to the structure from the proceeds of the fire and extended coverage policy along with penalties and attorney's fees.
On June 14, 1983, Darl Markham pleaded guilty to attempted simple arson with intent to defraud. Markham testified that Danny Gentry offered him $1,000 to burn down plaintiffs' residence. Markham stated that after the fire, Gentry paid him $100. Louisiana Farm Bureau amended its answer to delete arson as a defense.
Following a lengthy trial, the trial court rendered written reasons for judgment concluding that although defendant's evidence "strongly suggested" fraud with regard to many individual items listed in plaintiff's contents claim, plaintiff's contents list exceeded the policy limit, $35,000, by some $10,000, and that defendant had failed to show an overvaluation to this extent. The trial court found that the amount of structural damage incurred was $30,000. Additionally, the trial court held that defendant acted arbitrarily and capriciously in failing to tender any payment to plaintiffs or intervenor at least from the date that defendant amended its answer to delete arson as a defense, September 1, 1983, and was consequently liable for penalties and attorney's fees. Plaintiffs' claim for additional living expenses was rejected.
After written reasons for judgment were filed, Bank of Morehouse was substituted as intervenor in this proceeding as it had purchased, pursuant to an act of assignment and transfer, the two promissory notes secured by the first and second mortgages on the subject property, as well as all claims and rights of action of intervenor, Bastrop Federal Savings and Loan Association, and its successor, Pelican Homestead and Savings Association.
Following the rendition of written reasons for judgment, counsel for plaintiffs filed a rule alleging that the fee due counsel for plaintiffs should be paid in preference to any and all other interests or claims in this matter. Later, counsel for plaintiffs intervened into the lawsuit asserting the privilege for attorney's fees pursuant to *846 LSA-R.S. 9:5001, and alleged that the attorney's fees should be ranked as first privilege both on the amount of the judgment in favor of petitioners and, also on the amount of the judgment in favor of Bastrop Federal Savings and Loan Association and Louisiana Farm Bureau Mutual Insurance Company. Regarding these filings, the court held that plaintiffs' counsel had a privilege and priority of payment out of the award to plaintiffs, but that the preference and priority did not extend to the award made to intervenor for the structural damages to the insured premises.
The judgment herein was signed on December 4, 1983 but was not filed until January 17, 1984. Subsequent to the signing, but prior to the filing of the judgment, plaintiffs filed a pleading styled "Motion" alleging that the Bank of Morehouse filed suit by executory process against the Gentrys, seeking a writ of seizure and sale, and requesting that the sale be made without appraisement. The motion alleged that the property was sold for cash without benefit of appraisement to the Bank of Morehouse for $35,000. The motion further alleged that the property was then sold by cash deed to the Gentrys for $61,700. Through this motion, it was asserted that the Bank of Morehouse had no continuing interest in and to this policy of insurance or the proceeds therefrom because the mortgage had been extinguished and was fully satisfied and discharged.
Bank of Morehouse then filed an opposition to this motion alleging that plaintiffs' motion did not set forth any facts which showed that the claim was extinguished, arguing that the mortgagee was entitled to the proceeds of the policy due to the extent of his mortgage debt due at the time of the loss.
Subsequent to the filing of the judgment on January 17, 1984 and the reception of evidence on that same date with respect to intervenor's foreclosure on the subject property, plaintiff moved for a partial new trial on the same basis as that asserted in the pleading styled "Motion." The "Motion" and the motion for partial new trial were both thereafter denied and this appeal ensued.

Intervenor's Foreclosure
As authorized by LSA-C.C.P. Art. 2163,[1] plaintiffs have filed in this court an "Peremptory Exception of No Right or Cause of Action." This exception basically reiterates the claims raised by plaintiffs in post-trial motions, i.e., that intervenor, Bank of Morehouse, has neither a cause of action nor a right of action herein because the mortgage indebtedness covering the property in question has been fully liquidated and extinguished due to foreclosure proceedings filed by the Bank of Morehouse, in which the property was seized and sold without benefit of appraisal. Thus, the threshold issue in this litigation is the effect of the foreclosure without benefit of appraisement on the subject property by the Bank of Morehouse.
Parenthetically, we note that it appears the trial court was in error in failing to order a new trial on discretionary grounds as authorized by LSA-C.C.P. Art. 1973.[2] The action of intervenor in foreclosing subsequent to the trial of this suit seems to obviously have the potential to affect the interests of the parties in the funds at issue. However, the denial of the motion for new trial is not critical. All necessary evidence with respect to the foreclosure *847 was received in the consideration of the post trial motions by the trial court. Moreover, we have determined that the peremptory exception filed here raises the same issue. As we will hereinafter demonstrate, that issue may be properly considered as an exception of no right of action.
While the exception filed here is styled "Peremptory Exception of No Right or Cause of Action," exceptions of no right of action and no cause of action are separate and distinct motions, each serving a particular purpose and each following particular procedural rules. LSA-C.C.P. Art. 927(4), (5); Smith v. Livingston Parish Police Jury, 423 So.2d 5 (La.App. 1st Cir. 1982); Gustin v. Shows, 377 So.2d 1325 (La.App. 1st Cir.1979).
In Babineaux v. Pernie-Bailey Drilling Company, 261 La. 1080, 262 So.2d 328 (1972), the Supreme Court discussed the difference between exceptions of no right of action and no cause of action:
There has been much discussion about the purpose of the exception of no right of action, and many attempts to differentiate that exception from the exception of no cause of action. One of the best statements of the definition of no right of action and of the basis of the distinction between it and no cause of action was given by the late Henry George McMahon: "The former [no cause of action] is used to raise the issue as to whether the law affords a remedy to anyone for the particular grievance alleged by plaintiff; the latter [no right of action] is employed (in cases where the law affords a remedy) to raise the question as to whether plaintiff belongs to the particular class in whose exclusive favor the law extends the remedy, or to raise the issue as to whether plaintiff has the right to invoke a remedy which the law extends only conditionally." McMahon, The Exception of No Cause of Action in Louisiana, 9 Tul.L.Rev. 17, 29-30. See also McMahon, Parties Litigant in Louisiana, 11 Tul.L.Rev. 529-30. The exception of no right of action, however, cannot be invoked to determine whether a particular defendant can stand in judgment in a particular case, i.e., whether the right or remedy can be exercised against that defendant.
In Bielkiewicz v. Rudisill, 201 So.2d 136 (La.App. 3rd Cir.1967), Mr. Justice Tate of our court, then writing for the Court of Appeal, correctly stated the purpose of the exception of no right of action:
"The want of interest raised by the exception relates primarily to whether the particular plaintiff falls as a matter of law within the general class in whose favor the law grants the cause of action sought to be asserted by the suit, with the factual evidence admissible being restricted as to whether this particular plaintiff does or does not fall within the general class having legal interest to sue upon the cause of action asserted. * * *
"In short, the objection of no right of action raises the question of whether the plaintiff has a legal interest in the subject matter of the litigation, assuming (for the purpose of deciding the exception) that a valid cause of action is pleaded by the petition. LeSage v. Union Producing Co., 249 La. 42, 184 So.2d 727."
[footnotes omitted.]
In this case, intervenor's petition clearly discloses a basis upon which relief can be granted for the particular grievance alleged. Therefore, the exception of no cause of action is not the proper procedural vehicle for the assertion of this claim. This claim more properly addresses itself to intervenor's right to participate in the distribution of these funds.
To recapitulate, the documents filed in evidence on the hearing of the post-trial motions reflect that a petition for executory process was filed July 13, 1984 against Danny Ray Gentry and Paula Janice Green Gentry. Attached to that document is an order by the Bankruptcy Court relieving Pelican Homestead and Savings Association (the predecessor of Bank of Morehouse) from compliance with the court's order staying the proceedings *848 against the debtors Danny Ray Gentry and Paula Janice Green Gentry and authorizing the association to foreclose the mortgages of Danny Ray Gentry and Paula Janice Green Gentry. Also contained in the record is a writ of seizure and sale commanding the sheriff to sell the property without benefit of appraisement, and from the proceeds of the sale to pay to the Bank of Morehouse in preference to all other claims, the sum of $61,742.11, together with interest and attorney's fees. The sheriff's return, which was filed into evidence, reflects that on Wednesday, September 4, 1984, the property was sold to the Bank of Morehouse for the sum of $35,000. Costs of the sale were $1,520. The sheriff's return indicates that costs of the sale were paid and the balance of the bid amounting to $33,480 was retained by the purchaser as a credit on the debt. Both the mortgages were subsequently cancelled. On September 28, 1984, the Bank of Morehouse sold the property to Danny Ray Gentry and Paula Janice Gentry for $61,700 cash.
Appellants, the Bohns, argue that the interest of intervenor in the insurance proceeds, which is the extent of the mortgage balance, was completely extinguished by their act of foreclosure, and that any subsequent action to recover a portion of these insurance proceeds is barred as a prohibited action against a debtor's "other property" under the Deficiency Judgment Act.[3]
Treatment of this issue must begin with an examination of the text of the Deficiency Judgment Act and a discussion of the recent Supreme Court decision of Rushing v. Dairyland Insurance Company, 456 So.2d 599 (La.1984).
LSA-R.S. 13:4106 provides:
§ 4106. Deficiency judgment prohibited if sale made without appraisement
If a mortgagee or other creditor takes advantage of a waiver of appraisement of his property, movable, immovable, or both, by a debtor, and the proceeds of the judicial sale thereof are insufficient to satisfy the debt for which the property was sold, the debt nevertheless shall stand fully satisfied and discharged insofar as it constitutes a personal obligation of the debtor. The mortgagee or other creditor shall not have a right thereafter to proceed against the debtor or any of his other property for such deficiency, except as provided in the next paragraph.
If a mortgage or pledge affects two or more properties, movable, immovable, or both, the judicial sale of any property so affected without appraisement shall not prevent the enforcement of the mortgage or pledge in rem against any other property affected thereby.
[Emphasis supplied.]
In Rushing, the Supreme Court was presented with the issue of the effect of an extinguishment of the mortgage debt on the mortgagee's rights as a loss payee of an insurance policy on the mortgaged property. In that case, plaintiff sustained property damage to an insured and mortgaged automobile. Thereafter, plaintiff instituted suit for the insurance proceeds. Pending that litigation, the mortgagee instituted suit by executory process and sold the damaged truck without appraisal at a sheriff's sale. The mortgagee then purchased the damaged automobile for the costs of the sale. Following the purchase of the automobile, the mortgagee intervened into plaintiff's action claiming that, as loss payee, it was entitled to the insurance proceeds to the extent of the balance of the mortgage debt. The Supreme Court affirmed the Court of Appeal's dismissal of the mortgagee's intervention.
The Supreme Court noted that the insurance policy in question contained an open or simple loss payee clause which merely *849 provided in effect that the proceeds of the policy should be paid first to the mortgagee to the extent of his interest.
In further explaining the nature of the simple loss payee clause, the Court noted at page 601 that:
A simple loss payable clause such as the one in the instant case is no more than a provisional appointment by the debtor of the one to whom the proceeds of the policy shall be paid to the extent of that person's interest. Its purpose is to protect the mortgagee's interest, which is the balance of the mortgage debt. The interest that is insured, however, is the debtor's interest in the mortgaged property. Accordingly, when an insured loss occurs, the insurer is liable for the value of the loss to the extent of the policy limits and must direct payment to the loss payee up to the balance of the mortgage debt. Therefore, if the mortgage debt no longer exists, the loss payee is not entitled to any of the proceeds. See Bankston v. Commercial Credit Corp., 86 So.2d 245 (La.App. 1st Cir.1956). According to Couch on Insurance, supra § 42:695:
[W]hen the mortgage debt is extinguished in any manner it necessarily follows that the mortgagee is not entitled to any proceeds of insurance under the loss-payable clause.... [The clause acts only as] a provisional assignment of the contingent proceeds of the contract, and does not substitute the mortgagee for mortgagor as the insured party, so that the mortgagee's interest under the policy only extends to a security for his debt, and such interest ceases when the debt is extinguished.
Similarly, according to Appleman, Insurance Law and Practice § 3403 (1970):
[T]he full or partial extinguishment of the mortgage debt itself, whether prior to or subsequent to the loss, will preclude, to the extent thereof, any recovery on the policy by the mortgagee.
Thus, the court concluded that since the mortgage debt had been extinguished under the Deficiency Judgment Act by the mortgagor's foreclosure on the mortgaged property, the mortgagee's rights to the proceeds under the loss payable clause were likewise terminated. In so holding, the Court rejected Ford's contention that its intervention was permitted by the Deficiency Judgment Act because the action was not against "the debtor or his property," concluding with reliance upon In re Clover Ridge Planting & Manufacturing Company, Inc., 178 La. 302, 151 So. 212 (1933), that the proceeds of a fire insurance policy were owned by the debtor and were not assets of the mortgagee-loss payee. Hence, the holding of the Rushing decision is that a mortgagee who is named as loss payee under an open or simple loss payee clause in an insurance policy covering the mortgaged property, and who forecloses without benefit of appraisal, loses his right to the proceeds of that policy by virtue of the extinguishment of the mortgage debt under the Deficiency Judgment Act.
In developing the rationale for the Rushing decision, the Supreme Court distinguished between simple or open loss payee clauses and standard or union loss payee clauses. The nature and effect of a standard or union loss payee clause is more fully explained in May v. Market Insurance Company, 387 So.2d 1081 (La.1980), in a discussion of whether a mortgagee loss payee under a standard or union clause was an "insured" for purposes of the collection of penalties and attorney's fees under LSA-R.S. 22:658. In deciding the issue in the affirmative, the high court noted the following distinctions:
Mortgage clauses fall into two forms, the open or simple mortgage clause and the standard or union mortgage clause. The simple mortgage clause merely provides in effect that the proceeds of the policy shall be paid first to the mortgagee as his interest may appear; but the so-called standard or union mortgage clause is somewhat more specific in that it also provides that the mortgagee shall be protected against loss from any act or neglect of the mortgagor or owner, so that *850 it shall not defeat the insurance so far as the interest of the mortgagee is concerned. Couch on Insurance § 42:648 (2d ed. 1963).

. . . . .
Concerning the effect of the standard mortgage clause, Couch, supra § 42:694 provides:
Under the standard or union mortgage clause, an independent or separate contract or undertaking exists between the mortgagee and the insurer, which contract is measured by the terms of the mortgage clause itself. There are accordingly in substance two contracts of insurance, the one with the mortgagee, and the other with the mortgagor.
The mortgagee does not have the status of a beneficiary, and the effect is the same as though the mortgagee had procured a separate policy naming himself as the insured.
The consideration for the insurer's undertaking with respect to the mortgagee under the standard clause is the consideration for which the policy was itself issued to the mortgagor, and a standard mortgage clause creates a separate contract between the insurer and the mortgagee, and is enforceable by the mortgagee, even though it is merely engrafted onto the policy delivered to the mortgagor. [Footnotes omitted.]
The jurisprudence of this state is in accord with the view that a standard mortgage clause creates a separate contract of insurance between the insurer and the mortgagee.
[footnote omitted.]
Bankston v. Commercial Credit Corporation, 86 So.2d 245 (La.App. 1st Cir.1956), noted that under a standard or union loss payee clause, the interest of the mortgagee in the insurance proceeds extends only to the amount of the mortgage debt due at the time of the loss, the surplus being for the mortgagor.
The insurance policy herein is of the standard or union variety.[4] Intervenor would have us distinguish Rushing on this basis. Intervenor finds solace for this position in Federal National Mortgage Association v. Prudential Property and Casualty Insurance Company, 460 So.2d 45 (La. App. 1st Cir.1984). In that case, the contest for insurance proceeds was between the mortgagors and mortgagee-loss payee. There, the property was seized by the sheriff prior to a fire which substantially damaged a house built upon the mortgaged property. The property was then sold without appraisement to Federal.
The trial court decision in the Federal case was made before the Rushing decision was handed down. Consequently, the First Circuit decided that since the insurance policy was not in evidence and therefore, the type of loss payable clause could not be ascertained, the cause should be remanded for the introduction of the homeowners policy. Implicit in the decision to remand is the recognition that a different rationale *851 from Rushing might be appropriate if the policy contained a standard or union clause.
Intervenor argues that its rights to the insurance proceeds herein became vested at the time of the loss and that the subsequent extinguishment of the mortgage debt has no effect upon this right to recovery. However, plaintiffs point out that a similar argument by the loss payee in Rushing was rejected.
Furthermore, we find no merit in Ford's alternative contention that its interest under the loss payable clause is a separate and independent contractual right that became vested at the time of the accident and is not affected by the existence or fluctuation of the mortgage debt after that time. Under a simple loss payable clause, such as the one in the instant case, the mortgagee-loss payee does not have a separate and independent contractual right. The simple clause "merely makes the mortgagee an appointee, whereas the standard mortgage clause operates as a distinct and separate contract." Couch on Insurance, supra § 42:683. See Officer v. American Eagle Fire Insurance Co., 175 La. 581, 143 So. 500 (1932); Hardy v. Commercial Standard Insurance Co., 172 La. 500, 134 So. 407 (1931). Moreover, even if there was a vested contractual right to recovery, this right was lost by the mortgagee's own actions in causing the debt to become extinguished by provoking a sale without appraisal.

[Emphasis supplied.]
It must be recalled and reemphasized that the Rushing court had before it the issue of the effect of a foreclosure when the policy contained a simple or open loss payee clause, and not the standard or union clause which admittedly does create a separate contractual obligation vis a vis the mortgagee. Thus, we must decide whether the Supreme Court in the above quoted dicta intended for the same result to obtain in both open or simple loss payee clause situations and standard or union loss payee clause situations where the loss payee forecloses on the mortgaged property without benefit of appraisal. We conclude that it did.
The Rushing analysis hinges upon the characterization of the proceeds of a fire insurance policy containing an open or simple loss payee clause as property of the debtor in accordance with In Re Clover Ridge, supra, which also construed a simple loss payee clause. Thus, the action by the mortgagee in Rushing to obtain the insurance proceeds subsequent to a foreclosure without benefit of appraisal contravened the Deficiency Judgment Act which prohibits a subsequent action against the debtor "or any of his other property" for a deficiency.
The rationale of Rushing is equally logical when applied to an insurance policy containing a loss payee clause of the standard or union variety, even though as we have previously discussed, two separate contractual obligations exist and the mortgagee has a vested interest in the proceeds as of the time of the loss. However, when the mortgagee forecloses on the debtor's property without benefit of appraisal, the debt is extinguished insofar as it exists as a personal obligation of the debtor under the Deficiency Judgment Act. Therefore, the mortgagee's interest in the proceeds, which is the balance of the mortgage debt, is likewise reduced to zero. At that point, the entire fund representing the insurance proceeds is the property of the insured. Thus, an action by the mortgagee for recovery of the insurance proceeds subsequent to a foreclosure without benefit of appraisal is an action against property of the mortgage debtor, and is consequently precluded by the Deficiency Judgment Act.[5]
*852 An exhaustive study of Rushing and its antecedents convinces us that the extent of the vested contractual obligation is not established at the time of the loss, and that the extent of that obligation is affected by subsequent fluctuations in the mortgage balance.
Bankston is instructive at this point. In Bankston, plaintiff instituted suit against his collision insurer to recover the cost of satisfactory repair of an insured car. The mortgagee intervened in the action requesting payments of any proceeds from the insurance policy. Soon after the suit was filed, the mortgagee foreclosed on the automobile, sold it at a sheriff's sale without appraisement, and bought the car for the full amount of the indebtedness.
The First Circuit rejected an argument by the mortgagee that its right as mortgage creditor and named loss payee in the insurance policy containing a standard loss payee clause became fixed as the date of the loss, and was not affected by the subsequent act of the sale and purchase of the mortgaged property without benefit of appraisement. The insurer argued that although under the Deficiency Judgment Act, its right to a deficiency judgment against the mortgage debtor was lost, this defense was personal to the mortgage debtor and did not prevent the mortgagee from collecting the proceeds of the insurance policy from the insurer. The court stated:
To argue that despite the payment in full of the balance of the debt after the accident, nevertheless the mortgage creditor is entitled to collect the proceeds of the insurance policy over and above the total of the mortgage debt, overlooks that the primary purpose of the insurance policy, the premiums for which were paid by the named insured, is to pay the collision losses sustained by him, and the purpose or cause, Article 1896, LSA-Civil Code, of the "loss payable" clause is only to protect the mortgage creditor from loss of its security up to the amount of the debt through collision accident and dispersion of the proceeds by the insured, its mortgage debtor.
Therefore, although the Bankston court determined that the mortgagee's interest extended to the amount of the mortgage debt due at the time of the loss, the court gave effect to the foreclosure which occurred after the time of the vesting of the mortgagee's contractual rights. Thus, Bankston's rationale is consistent with our own.
Our analysis also gives heed to the policy statement in Rushing:
Our holding is consistent with the debtor protection policy promoted by the Deficiency Judgment Act. In situations involving a mortgagee-loss payee, a sale without appraisal will often result in the debtor being harmed by receiving a smaller portion of the insurance proceeds being divided between him and the mortgagee-loss payee than if the sale was with appraisal. Further recovery by the creditor would be contrary to the spirit of the Act despite the inequities that may result in a particular case.
Furthermore, it cannot be successfully argued that the mortgagee is protected by the statement in the loss payee clause which provides "this insurance ... shall not be invalidated by an act or neglect of the mortgagor or owner of the within-described property, nor by any foreclosure...." Initially, although a standard or union loss payee is protected from actions of the mortgagor or owner which invalidate the insurance viz., arson, a standard or union clause will not preserve a mortgagee's interest in the proceeds from its own action in foreclosing without appraisal. Moreover, the public policy espoused by the Deficiency Judgment Act is superior to the provision in the clause which states that a foreclosure will not invalidate the contract with respect to the mortgagee. LSA-R.S. 13:4107. A mortgagee loss payee under a standard or union clause can give effect to this provision by obtaining an appraisal of the property and following the requisites of *853 law for preserving a deficiency of the debt after foreclosure.
Thus, it is our determination that from any standpoint, the action of the mortgagee in foreclosing without benefit causes it to lose any interest in the proceeds of the fire policy. The homeowner gains that interest. The intervenor therefore has no legal interest in the subject matter of this litigation and the exception of no right of action is valid. Therefore, the exception of no right of action filed in this court is sustained.

Insurable Interest
Farm Bureau argues that the Bohns had no insurable interest in the damaged property because on the face of the public records, the Gentrys owned the property.
We notice that the affirmative defense of lack of an insurable interest was not pleaded by Farm Bureau, but was instead pleaded by intervenor, Bank of Morehouse. However, this position is untenable on its merits.
LSA-R.S. 22:614 defines insurable interest:
§ 614. Insurable interest required; property insurances
A. No contract of insurance on property or of any interest therein or arising therefrom shall be enforceable except for the benefit of persons having an insurable interest in the things insured.
B. "Insurable interest" as used in this Section means any lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage.
In Young v. State Farm Fire & Casualty Insurance Company, 426 So.2d 636 (La. App. 1st Cir.1983), writs denied, 433 So.2d 148, 171, the First Circuit explained:
This definition does not require an ownership interest in order to have an insurable interest. State Farm Mut. Auto. Ins. Co. v. Price, 378 So.2d 599 (La.App. 3d Cir.1979). See Stokes v. Republic Underwriters Ins. Co., 387 So.2d 1261 (La.App. 1st Cir.1980), and Brewster v. Michigan Millers Mutual Insurance Co., 274 So.2d 213 (La.App. 2d Cir.1973).
In Brewster, a father was held to have an insurable interest in a house he built for his sons because he had retained possession and control of the house, the right to live in it, rent it to others, or to use it as he wished. In Stokes, a woman was held to have an insurable interest in her aunt's house because she lived there with her aunt's permission. Even though the woman could not demand she be allowed to stay in the house, her right of occupancy was deemed to have some pecuniary value. In Price, a good faith purchaser of a stolen automobile was held to have an insurable interest, even though he did not actually own the car. The insurable interest was derived from his possession of the car and his interest in preserving the car due to the substantial sum he had paid for the car's repair.
The First Circuit in Young concluded that a father who constructed a house for his son, investing much time and money in its construction, and who had been in actual possession of the house for three or four months prior to the fire, had an insurable interest in the premises. The court noted that the right of occupancy alone yielded an insurable interest.
Clearly, in this instance, the Bohns, who lived in the house, paid a sum of money in excess of $15,000 to the Gentrys for their equity in the house, assumed the mortgage note albeit sans the public records and thereby became solidarily liable with the Gentrys on the mortgage indebtedness (See LSA-R.S. 6:833), had a lawful and substantial economic interest in the preservation of this property. As such, they had an insurable interest in this property. This specification of error lacks merit.

Award for Contents
Farm Bureau complains that the trial court did not accord proper weight to the evidence of plaintiffs' intentional representation of their contents loss. Defendant claims that certain values assigned by *854 plaintiffs to property allegedly destroyed were inflated. Farm Bureau further claims that other items listed as destroyed by the fire were either not present at the home at the time of the fire, were not damaged by the fire, or were salvaged. Farm Bureau argues that this misrepresentation equals fraud which would void the policy.
The instant insurance policy contains the following clause:
(Concealment fraud) This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.
It is well settled that fraud and false swearing with intent to deceive and defraud an insurance company in the event of a loss by fire voids the policy. Sims v. Equitable Fire and Marine Insurance Company, 170 So.2d 163 (La.App. 4th Cir. 1964), and the cases cited therein.
Plaintiffs had the burden of proving the extent of their loss at trial. See Williams v. Fire Ass'n of Philadelphia, 193 So. 202, (La.App. 2d Cir.1939). In Young, supra, it was held that where the best available evidence of the loss of contents is plaintiff's testimony, such will suffice to establish proof of loss in a suit for the proceeds of a fire policy.
However, in a suit on a valued fire policy, the burden is on the insurer to prove that the insured made misrepresentations as to the loss relied on by the insurer to avoid the policy and that the misrepresentations were knowingly made with fraudulent intent. Garnier v. Aetna Insurance Company of Hartford, Conn., 181 La. 426, 159 So. 705 (1935).
In Garnier, the Supreme Court held that overvaluation by the insured of a fire loss will avoid a valued fire policy where knowingly and willfully made, but not where the overvaluation was due to mistake or inadvertence. The fact that an insured submits a claim which is questioned by the insurer and which is later reduced in amount by the insured, has been held not to constitute fraud or misrepresentation on the part of the insured per se. G.U. Rybiski & Company v. Louisiana Coastal Underwriters of Audubon Insurance Company, 369 So.2d 1097 (La.App. 1st Cir.1979). Accord Culpepper v. Federal Crop Insurance Corporation, 274 So.2d 815 (La.App. 3d Cir.1973). Young, supra, held that although a second inventory, prepared in response to a fire insurer's interrogatories, differed substantially from the original inventory prepared shortly after the fire as to specific contents of the house and to the value thereof, the discrepancy in itself did not constitute fraud or misrepresentation by the insured. Furthermore, in Sbisa v. American Equitable Assurance Company of New York, 202 La. 196, 11 So.2d 527 (1942), the Supreme Court held that a fire policy on a truck was not voided by false swearing as to particular items of the construction cost, where even after deducting certain items falsely sworn to from the loss claimed or proved, the claim would still exceed the face value of the policy.
In the case at bar, plaintiffs submitted an inventory list shortly after the fire to William Sigler, the adjuster for Farm Bureau. The value of items listed amounted to $44,564. Plaintiffs later submitted a proof of loss for unscheduled personal property in the amount of $35,000. William Briggs, who was the district claims supervisor for Farm Bureau, testified that the normal procedure for assessing a contents loss after a fire was to have the insured list the contents, time of purchase, purchase price, and age of the article. Then, the list is verified by a comparison with the remaining property. Once there is a comparison, the insurance company determines the depreciated value or actual cash value. Briggs also stated that the Bohns had supplied a list of damaged contents containing the information required.
William Sigler testified that he took no photographs, made no independent inventory of the contents of the residence, and did *855 not attempt to assign values to items on the list. Farm Bureau did not attempt to compile a list of contents for comparison with the contents list submitted by the Bohns. William Briggs testified that he and Sigler never reached a figure which they thought fairly reflected plaintiff's contents loss. He also stated that they simply did not believe plaintiffs' loss as listed was accurate.
Mr. Sigler, in answer to questions posed by plaintiffs' counsel in a deposition which was submitted into evidence stated that he thought that the following items were not present on the premises at the time of the fire:
1 silver gray tuxedo; 8 men's western suits; a trumpet; 12 men's caps; 1 ladies' velour pant suit; 2 pairs of ladies' leather boots; 1 pair ladies' western boots; and 24 men's dress shirts.
Following the listing of items which Sigler thought not to have been present at the time of the fire, the following colloquy transpired.
Q. Mr. Sigler, I think the last question was we talked about your looking at the inventory seeing "20 long-sleeved monogrammed shirts" and you said you found thirteen. And then I think the next question was: Were there any other items? And your response was
A. I think my response was that that is the main items that I did not find.
Q. Well, I want to be a little bit more exact. You said, "main items." Were there any other items that you felt
A. This is after I got the contents list and checked it that I did not find some of the items.
Q. All right. Now, are there any other items from the inventory list that was furnished to you that you believe were not there on November the 10th, 1982?
A. I think that was the only items.
Later in this same deposition, Sigler agreed that the total value of the items he found to be absent was only a few thousand dollars.
The record evidence concerning the extent of plaintiffs' loss to the contents of the home was extremely confusing partly because of J. Mack Bohn's evasive testimony and his wife's failure to testify at trial. Furthermore, the method that plaintiffs used to list their loss added to the chaotic nature of this record. Nevertheless, plaintiff, J. Mack Bohn testified as to the contents loss at trial. Also in plaintiffs' case in chief, photographs of the residence were introduced, and a furniture retailer testified as to the value of the furniture. The trial court weighed this evidence and concluded that although defendant's evidence strongly suggested fraud with regard to many individual items, plaintiffs' contents list exceeded the policy limits for unscheduled property loss by almost $10,000 and found that the defendant had failed to demonstrate an overvaluation to this extent. Implicit in this finding is the conclusion that plaintiffs proved a contents loss of $35,000 and that defendant failed to sustain their burden of proving fraud. Considering this record, we can find no manifest error in that conclusion. This specification lacks merit.

Award for Structural Damage
Both plaintiffs and defendant claim that the structural damage award in the amount of $30,000 was inappropriate. Defendant claims that the trial court erred in rejecting a bid of $19,036.53. Plaintiffs argue that the award should be increased in accordance with a higher bid of $35,302.41.
Three estimates for the structural repair of the residence were obtained. The defendant Farm Bureau obtained two estimates to repair the structural damage. One estimate was submitted by Ray Brothers Contracting Company on November 29, 1982 in the amount of $19,036.53. Another estimate obtained by Farm Bureau was from Bisco Builders on May 9, 1983 in the amount of $29,897.00. Plaintiffs obtained an estimate from Bastrop Roofing and Construction *856 Company on January 19, 1983 in the amount of $35,302.41.
At trial only two of the three contractors testified as to their bids. Marvin Ray of Ray Brothers Contracting Company testified on behalf of the defendant. During his testimony, it was adduced that this contractor had no state license, and that a license was required if the total amount of the work exceeded $20,000.00. Jimmy Christmas of Bastrop Roofing and Construction Company testified and detailed the specifics of his bid into the record. No representative of Bisco Builders which tendered the $29,897.00 estimate for structural repair testified.
After hearing the testimony, the trial court concluded in its reasons for judgment:
Actually, it can be presumed that the defendant had not much faith in its own low estimate because the defendant obtained another estimate which, although not detailed into the record, amounted to $29,897.00. The plaintiff's estimate of structural damage was $35,302.41. By its own estimate, it seems therefore that the defendant recognizes a loss of approximately $30,000 in structural damage and this is the amount this Court will fix as owed by the defendant for the fire damage to this structure.
Clearly, the low bid was rejected by the trial court. Considering the contractor's lack of a state license and certain criticism which was leveled at this contractor by representatives of the bank in regards to his work product, this decision is supported in the record. Since a representative of Bisco Builders was not called to testify, the only other evidence in the record to support a structural damage award was the estimate and testimony of Jimmy Christmas from Bastrop Roofing and Construction Company in the amount of $35,302.41. Consequently, it was clearly wrong for the trial judge to assess any other amount. Therefore, the trial court award for structural damages must be increased to the sum of $35,302.41.

Penalties and Attorney's Fees
Defendant complains that the trial court was clearly wrong in its determination that the insurer was arbitrary and capricious in failing to pay the undisputed portion of this claim and in awarding penalties and attorney's fees in connection with that non-payment. The defendant argues that its non-payment was justified by the evidence of arson.
LSA-R.S. 22:658 provides that an insurer who arbitrarily refuses to pay a claim within sixty days of satisfactory proof of loss shall pay a penalty of twelve percent damages on the total amount of the loss, plus reasonable attorney's fees. Since LSA-R.S. 22:658 is a penal statute, it must be strictly construed. The penalty must not be assessed unless the refusal to pay was arbitrary, capricious, or without probable cause. Young v. State Farm, supra.
In this case, certain information was available to the insurer which gave it cause to make a reasonable investigation into the circumstances surrounding the fire. Arson was immediately suspected. A gas can containing flammable liquid was found inside the house and evidence of a forced entry into the home was discovered. There were also indications that the alleged arsonist stated that he was supposed to remove a tractor from the garage before setting fire to the house, and that J. Mack Bohn had contacted a neighbor upon hearing about the fire to ascertain whether or not his tractor had been damaged in the fire. William Price, a self-employed insurance claims investigator hired by Farm Bureau to look into the matter determined that Bohn was experiencing financial reverses. Several lawsuits had been filed against him and certain judgments had been obtained and recorded in the public records. Price discovered that a suspect had been taken into custody shortly after the fire but testified that he was told by an assistant district attorney that the cause of the fire was still under investigation and that Bohn had not been eliminated as a suspect. Based in part on Price's information, Farm Bureau elected not to pay until *857 the arrestee in the arson case could be deposed.
On the advice of his attorney, the arsonist's testimony was not available until after the criminal proceedings against him were concluded. Darl Markham pleaded guilty on June 14, 1983 to attempted simple arson with intent to defraud and was sentenced on that charge on August 23, 1983. He was then deposed by Farm Bureau the next day. In his deposition, Markham did not implicate Bohn but rather stated that he was offered $1,000 by Danny Gentry to set fire to the house and that he was later paid $100 by Gentry. After his deposition was obtained, Farm Bureau deleted the affirmative defense of arson from its answer on September 1, 1983. Farm Bureau never made a tender of payment to either plaintiff or intervenor for any portion of the loss, either for the damage to the structure or to that of the contents of the home.
The trial court found that although the insurance company had reason to initially suspect that J. Mack Bohn was involved in the arson, later information in their possession made that suspicion less valid and tended to support Markham's statement implicating Gentry, the record owner of the property. The trial court held that some tender of payment should have been made at least by the date that Farm Bureau deleted arson as a defense from its answer and, consequently, awarded penalties and attorney's fees to both plaintiff and intervenor.
In Benoit v. American Mutual Insurance Company of Boston, 236 So.2d 674 (La.App. 3d Cir.1970), writ denied, 256 La. 874, 239 So.2d 366 (1970), plaintiff instituted suit against his home insurer for payment of damages to his home and the contents as a result of a fire. Arson was initially suspected. The court noted that after receiving the final report from the state fire marshal's office, the defendant knew that there was no evidence at all to indicate that the plaintiff had burned the house or procured its burning, and that the defense of arson was simply not available. The court also noted that as of that time, the defendant knew by virtue of its own estimate the amount of the structural damage. The court found that the insurer acted in an arbitrary and capricious manner in failing to tender payment for the loss of the structure after the elimination of the plaintiff as a suspect in the arson investigation and an ascertainment of the amount of damage. However, the court failed to award penalties and attorney's fees on that part of the damage award which represented the contents loss, as plaintiff had not given an estimate or proof of loss concerning that item, which justified the refusal to tender payment for that item until an estimate could be obtained.[6]
Here, defendant removed the defense of arson from this trial except insofar as it related to the issue of penalties and attorney's fees. At the point that the defendant knew that the arson defense was no longer available to it, and could ascertain the loss *858 sustained, Farm Bureau became arbitrary and capricious in its failure to pay.
The defendant knew of a structural loss of at least $19,000 by their own estimate as of November 29, 1982. Although they disputed the amount due for contents loss, they made no effort to ascertain the extent of that loss choosing only to rely on their claim that the plaintiff overestimated their losses. According to the facts of this case, defendant should have made a tender of payment at least from the time it became apparent that the defense of arson was not available and they chose not to litigate that claim. See Riverland Oil Mill, Inc. v. Underwriters for Lloyds', New York, 368 So.2d 156 (La.App.2d Cir.1979), writ denied, 369 So.2d 1365 (La.1979).
Additionally, plaintiff complains that the award of attorney's fees to plaintiff's counsel in the amount of $3,500 is so low as to constitute an abuse of discretion.
The amount awarded as attorney's fees is left largely to the discretion of the trial court. The factors which are generally considered in determining the amount of such an award will include the degree of professional skill and ability exercised, the amount of the claim, and the amount recovered for the plaintiff, and the time devoted to the case. Each case is considered in light of its own facts and circumstances. In all instances, however, the amount awarded must be reasonable. Artigue v. Louisiana Farm Bureau Mutual Insurance Company, 339 So.2d 880 (La.App.3d Cir.1976), writ denied, 341 So.2d 1132 (La. 1977); Bezue v. Hartford Accident and Indemnity Company, Hartford, Connecticut, 224 So.2d 76 (La.App. 1st Cir.1969); Ray v. Superior Iron Works and Supply Company, Inc., 284 So.2d 140 (La.App. 3d Cir.1973), writ denied 286 So.2d 365 (La. 1973).
This litigation involves issues which are both complex and difficult. A great degree of professional skill and ability was needed for the successful prosecution of this claim. Plaintiffs' counsel filed into evidence his time schedule on this case. The time schedule reflects that plaintiffs' counsel spent approximately 153 hours for the preparation of this case at the trial level. The amount eventually recovered by the plaintiffs is in excess of $70,000. Considering these factors and the purpose of the statute allowing the imposition of penalties, we conclude that the trial judge's award for attorney's fees in the amount of $3,500 to plaintiffs' counsel represents an abuse of discretion and must be increased. We conclude that an award of $12,500 is reasonable and will sufficiently compensate plaintiffs' counsel for his work on both the trial and appellate level of this case.
Because we have concluded that intervenor has no right of action in this cause, it is unnecessary to address the remaining claims made on appeal.
For the reasons previously expressed, the judgment of the trial court is amended in part and affirmed as amended. It is recast to read as follows:
IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the exception of no right of action filed in this court by the plaintiffs, J. Mack Bohn and Sheila Bohn, and against intervenor, Bank of Morehouse, be and is hereby sustained.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of J. Mack Bohn and Sheila J. Bohn and against the defendant, Louisiana Farm Bureau Mutual Insurance Company, in the full amount of $70,302.41, in addition to twelve (12%) percent penalty, and attorney's fees of Twelve Thousand Five Hundred and No/100 Dollars ($12,500), with legal interest on all of the said amounts from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the privilege for attorney's fees pursuant to a contract of employment between J. Mack Bohn and Sheila J. Bohn is hereby recognized on all amounts awarded herein.
All costs of this appeal are assessed against defendant, Farm Bureau.
*859 APPELLATE EXCEPTION SUSTAINED. AFFIRMED IN PART, AMENDED IN PART and RENDERED.
NOTES
[1] LSA-C.C.P. Art. 2163 provides in pertinent part:

Art. 2163. Peremptory exception filed in appellate court; remand if prescription pleaded
The appellate court may consider the peremptory exception filed for the first time in that court, if pleaded prior to a submission of the case for a decision, and if proof of the ground of the exception appears of record.
If the ground for the peremptory exception pleaded in the appellate court is prescription, the plaintiff may demand that the case be remanded to the trial court for trial of the exception.
[2] Art. 1973. Discretionary grounds

A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law.
[3] The Bohns became solidary obligors with the Gentrys upon their assumption of the mortgage debt by virtue of LSA-R.S. 6:833. Consequently, they became "debtors" under the Deficiency Judgment Act so that the foreclosure without benefit of appraisal extinguished their obligation insofar as it constituted a personal debt, along with the personal obligation of the Gentrys.
[4] The loss payable clause in this policy states "Loss, if any, shall be adjusted with the Named Insured and shall be payable to him unless other payee is specifically named hereunder."

The policy also states in the Memorandum of Insurance:
Loss or damage, if any, under this policy, shall be payable to the mortagee(s) listed on the reverse side of this declaration as their respective interests may appear under any present or future mortgages, with the right to grant partial release of mortgage without notice to this Company, and this insurance, as to the interest of the mortgagees (or trustees) only therein, shall not be invalidated by an act or neglect of the mortgagor or owner of the within-described property, nor by any foreclosure or other proceedings or notice of sale relating to the property, nor by any change in the title or ownership of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by this policy; provided that the mortgagees (or trustees) shall notify this Company of any change of ownership or occupancy or increase of hazard which shall come to the knowledge of said mortgagees (or trustees) and, unless permitted by this policy, it shall be noted thereon and the mortgagees (or trustees) shall, on demand, pay the premium for such increase hazard for the term of this use thereof; otherwise this policy shall be null and void.
[5] We are cognizant of the cases of American Bank & Trust Company v. Byron, 347 So.2d 850 (La.App.2d Cir.1977), writ denied, 351 So.2d 155 (La.1977); and Guinn v. Houston Fire & Casualty Insurance Company, 32 So.2d 613 (La.App.1st Cir.1947) which support the proposition that the extent of the mortgagee's interest is determined at the time of the loss such that a subsequent foreclosure without benefit is of no effect. In our view, that logic is inconsistent with the holding of Rushing.
[6] Cf. Headrick v. Pennsylvania Millers Mutual Insurance Company, 257 La. 1101, 245 So.2d 324 (1971); Howard Motors, Inc. v. Beeson, 453 So.2d 652 (La.App.5th Cir.1984); Young v. State Farm Fire and Casualty Insurance Company, 426 So.2d 636 (La.App. 1st Cir.1982), writs denied, 433 So.2d 148, 171 (La.1983); Stokes v. Republic Underwriters Insurance Company, 387 So.2d 1261 (La.App.1st Cir.1980); Baghramain v. MFA Mutual Insurance Company, 315 So.2d 849 (La. App.3d Cir.1975), writs denied, 320 So.2d 207, 209 (La.1975); Stevenson v. Central National Insurance Company of Omaha, Nebraska, 239 So.2d 659 (La.App.1st Cir.1970); and Bennett v. Niagra Fire Insurance Company, 126 So.2d 718 (La.App.3d Cir.1961). Where there were suspicious circumstances surrounding the fire and the insurer unsuccessfully litigated an arson defense, a failure to pay was held to be not arbitrary, capricious or without probable cause. Consequently, penalties and attorney's fees were denied. Compare with McClain v. General Agents Insurance Company of America, Inc., 438 So.2d 599 (La.App.2d Cir.1983), writ denied, 442 So.2d 458 (La.1983); Dauzat v. Amco Underwriters of Audubon Insurance Company, 386 So.2d 963 (La.App.3d Cir.1980); Artigue v. Louisiana Farm Bureau Mutual Insurance Company, 339 So.2d 880 (La.App.3d Cir.1976), writ denied, 341 So.2d 1132 (La.1977), where it was held that the insurer's evidence of arson against plaintiff was not strong enough to prevent imposition of penalties and attorney's fees for arbitrary and capricious failure to pay.