[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
REVISED MEMORANDUM OF DECISION ON SCASCO'S MOTION TO STRIKECOMPLAINT OF CONNECTICUT WATER COMPANY[1]
The Connecticut Water Company (C.W.C.) Has brought suit against the Standard Cycle and Auto Company (SCASCO) and the Town of Thomaston for damages allegedly resulting from the contamination of its well field which is located below property owned and used as a maintenance garage by the town. The town garage property contains below the surface gasoline tanks which have at various times been installed, operated, maintained, filled or owned by SCASCO and the town. CT Page 4511
On April 4, 1996 C.W.C. filed a Second Revised Amended Complaint containing three counts against the town and five counts against SCASCO. On May 13, 1996, SCASCO filed a motion to strike all the counts directed against SCASCO. On June 10, 1996 C.W.C. amended its complaint with the purpose of addressing certain alleged deficiencies in the April 4th complaint but SCASCO has filed another motion to strike against the June 10, 1996 complaint. This complaint asserts the following counts against SCASCO: The Fourth Count alleges negligence, the Fifth Count seeks recovery under § 22a-452 of the general statutes, the Sixth Count is based on negligent nuisance, the Seventh Count Absolute Nuisance, and the Eighth Count asserts a CUTPA violation. The prayer for relief makes a claim for litigation costs and attorney's fees pursuant to CUTPA § 42a-100a et seq. The Motion to strike is directed against all the SCASCO counts and the prayer for relief.
The standard to be applied in resolving a motion to strike is well-known. The facts alleged in the complaint are to be construed in a way that is most favorable to the plaintiff.Amodio v. Cunningham, 180 Conn. 80, 82 (1980).
1.
The motion to strike against the Fourth and Fifth Count can be treated in one discussion. The motion to strike alleges that the Fourth Count, the negligence count, fails to state a cause of action because only legal conclusions of negligence are plead. The Fifth Count incorporates the negligence allegations of the Fourth Count and the motion to strike makes the same argument against the viability of the Fifth Count that it makes against the Fourth Count.
In the ninth paragraph of the Fourth Count, which is incorporated in the Fifth Count, the basic allegation is made that the plaintiff's well field has been contaminated due to the discharge, spillage, uncontrolled loss, seepage, or filtration of contaminants from tanks SCASCO supplied installed, owns or has owned, operates or has operated and maintains or has maintained. The Fourth Count then makes the following allegation in the 13th paragraph:
 13. The contamination of the Well Field is the result of SCASCO's negligence in that: CT Page 4512
 a. SCASCO, its agents and employees, failed to maintain properly the Tanks and delivery trucks so as to avoid such discharges.
 b. SCASCO, its agents and employees, failed to operate properly the Tanks and delivery trucks so as to avoid such discharge.
 c. SCASCO, its agents and employees, failed to install and remove properly the Tanks located on the Town Garage Property.
 d. SCASCO, its agents and employees, failed to supervise properly the installation, removal, operation, refilling and other uses related to SCACO's ownership installation, maintenance, delivery, filling, operation, supervision of operation or removal of the Tanks.
 e. SCASCO, its agents and employees, failed to supply and fill properly the Tanks.
Are the allegations in paragraph 13 conclusory or put another way, is the allegation of negligence legally insufficient because it does not make sufficient factual allegations to support a negligence theory?
Connecticut is a fact pleading state as is made clear in §§ 108 and 109 of the Practice Book. Failure to make the necessary factual allegations in a complaint can be used as a basis to file a request to revise or a motion to strike, cfMoller v. Horton, Connecticut Practice, commentary at page 275,Grand East Properties v. Phillips, 2 Conn. Ops 376 (1996). InSmith v. Furness, 117 Conn. 97, 99 (1933) the Court said:
 "The adverse party has the right to have the facts appear so that the question whether they support the conclusion may be determined and that he (sic) may have the opportunity to deny them. . . . A pleading defective in alleging a conclusion without facts to support it is demurrable" CT Page 4513
A later case said the following:
 "The burden rests on the plaintiff to allege a recognizable cause of action, and it is not sufficient that a complaint refer to a basis of liability by some distinctive name . . . A demurrer does not admit legal conclusions; . . . and in any action, the complainant is required to set forth facts upon the basis of which, if true, he (sic) may be able to establish in law a right to relief, for, unless that is done, the pleading is demurrable."
Research Associates Inc. New Haven Redevelopment Agency,157 Conn. 587, 588-589 (1968).
But this rule is difficult to apply. It is true as the plaintiff says that under P 13 § 108 evidence need not be plead but "material facts" must be plead. The question on a motion to strike is what is a fact as opposed to a mere conclusion. If simply a conclusion of law is plead — for example "the defendant was negligent" — the pleading would be demurrable at common law and thus subject now to a motion to strike since a motion to strike does not admit conclusions of law. Such an allegation sets no limits to the issues that can be raised or the evidence that will be material at trial. There is a discussion of this matter in Connecticut Civil Procedure, Stephensen, Vol. I, § 86, pp 348-350. Using an archaic example Stephensen points out that: "An allegation that the defendant `negligently' drove against the plaintiff's cart is at once a conclusion of fact and a conclusion of law. It is sufficiently an allegation of fact to support a judgment but it is likewise enough of a conclusion of law to require a more specific allegation of the acts of negligence relied on if requested by the defendant." Thus under this analysis such a complaint would not be demurrable or subject to a motion to strike although a request to revise asking for more specific statements would be granted.
Stephensen cites two cases that illustrate the problem and particularly address the issue of the appropriateness of a motion to strike as opposed to a request to revise. In Jordan v. Apter,92 Conn. 302, 305 (1919) the Court held a complaint which alleged the defendant operated an automobile "carelessly and negligently" CT Page 4514 and at a "reckless speed" states a cause of action although the defendant could have demanded a more specific statement. Stephensen thus believes such a complaint is not demurrable: "As it stands the complaint will restrict the evidence to the manner in which the defendant operated the car. Evidence of careless maintenance by the defendant or careless operation by a servant would not be admissible," § 86 at p. 350. On the other hand in Milaneseo v. Calvanese, 92 Conn. 641, 642 (1918) a statement that the consideration for a contract was "grossly inadequate" is a "conclusion of law and must be supported by the facts and circumstances justifying the conclusion". Likewise in Maruca v.Phillips, 139 Conn. 79, 81 (1952) "where a claim for damages is based upon fraud, the mere allegation that a fraud has been perpetuated is insufficient; the specific acts relied on must be set forth in the complaint."
Stephensen says that in Milaneseo and Maruca no "facts" are even hinted at. "The pleading gives absolutely no clue as to the nature of the subordinate issues that will be involved on trial, no indication of what the consideration was which is claimed to be inadequate or what acts constituting fraud were performed by the defendant," § 86 at p. 350.
If the only allegations made here were those contained in 13 a, b and/or d then a motion to strike would be appropriate. Read separately or together they are completely conclusory and give "no clue as to the nature of the subordinate issues that will be involved" in the trial for the simple reason that they cover the whole universe of how the human species, or at least its business component, relates to storage tanks.
Using the Stephensen analysis, however, and the reasoning of the previously referred to cases, the allegations of 13c and e prevent the court from granting a motion to strike. Each of these paragraphs allege a discrete area of activity concerning which there is an allegation of negligence and thus there will be a limitation of the proof and the allegations can support a judgment.
The defendant has referred to a decision of this court to support its position, Grand East Properties v. Charlotte Phillipset al, 2 Conn. Ops 376 (1996). The problem with any reliance on that opinion for use in this case is that none of the actual factual allegations made in the complaint are referred to in the opinion. In that sense, the analysis is too superficial to be of CT Page 4515 much use. In other words, none of the general observations in that case prevent the result reached here.
However, in reaching this decision, I do not rely on the plaintiff's analysis of D'Ulise v. Board of Directors,202 Conn. 206, 220 (1981) and Kleen v. General Motors Corp.,36 Conn. Sup. 347 (1980).
In D'Ulise the defendants objected in their motion to strike to the allegation of negligent misrepresentation claiming the complaint failed to explain the nature of the defendants' negligence and instead alleged in a conclusory fashion that the defendants misrepresented certain facts, 202 Conn. At p. 219. The discussion on the following page seems to indicate the real concern was whether the "nature of the defendants' negligence" was alleged precisely enough. The Court goes on to say "if the defendants were in doubt as to the nature of this claim or the legal theory underlying it" they could have filed a request to revise, id p. 220. On page 208 the court sets forth the detailed factual allegations contained in the complaint. The issue inD'Ulise was whether the factual allegations of the complaint supported the legal theory asserted not as here whether there were no factual allegations as required by our practice, but merely an assertion of a legal theory — i.e., negligence or the defendants did not act properly. D'Ulise is of no real help on the problem now before the court. Also, Kileen v. General Motors,
supra, is a special category of case. It is true that this is a fact pleading state but some substantive law claims by their very nature perhaps preclude the ordinary application of pleading rules requiring the setting forth of factual allegations. InKileen the defendant car manufacturer's request to revise was not granted. The court reasoned that the purpose of such a request is to obtain a statement of material facts on which a complaint is based but noted that a specific defect is not essential in establishing a cause of action in strict liability actions so that the request need not be granted. Likewise, if a res ipsa loquitur theory were properly raised by a fair construction of a complaint, how could the lack of detailed factual allegations prompt a granting of a request to revise or, a fortiori, the granting of a motion to strike? In any event, the court does not deny the motion as to these counts on the basis of D'Ulise orKileen but does so far the reasons previously stated.
2. CT Page 4516
In the Sixth Count there is a claim of negligent nuisance. It is alleged in paragraph 13 that the presence of contaminants has an actual tendency to create danger and inflict injury on persons or property and constitutes an unreasonable interference with CWC's use and enjoyment of its well field. The fourteenth paragraph states this danger created by the presence of contaminants on or beneath the property was and is a continuing one and the next paragraph alleges SCASCO's past and present use of the tanks and delivery trucks to permit the contaminants to be present in a discharged and released from is unreasonable and unlawful.
The Seventh Count makes a claim for absolute nuisance against SCASCO. The allegations of the Seventh Count repeat those of the Sixth Count but the Seventh Count in its fourteenth paragraph adds a claim that the condition the plaintiff complains of is the result of SCASCO's "past and present intentional conduct."
In what is a rather narrow attack on these counts, the defendant cites Green v. Ensign-Bickford Co., 25 Conn. App. 479,490 (1991) which holds that the following four conditions must be alleged to state any type of nuisance claim under Connecticut law:
 "1) The condition complained of had a natural tendency to create danger and inflict injury upon person or property;
2) the danger created was a continuing one;
 3) the use of the town garage was unreasonable or unlawful; and
 4) The existence of the nuisance was the proximate cause of CWC's injuries and damages.
The basis of the motion to strike these counts is solely that "CWC has failed to allege a `condition' which, first, by its very nature (is) likely to cause injury and, second, was unreasonable or unlawful." May 13, 1996 brief, page 9. The July 8, 1996 brief at page 8 just paraphrases the first requirement under Green and then goes on to state: "Because the existence of a `condition' has not been properly alleged by CWC, the nuisance counts should be stricken." That's the sole argument made so that the court CT Page 4517 will not deal with the other Green conditions or the other requirements of these two types of nuisance or the viability of nuisance claims given the facts of his case.
The cases relied upon by the defendant are Filisko v.Bridgeport Hydraulic Co., 176 Conn. 33, 36 (1978); Koystal v.Case, 163 Conn. 92, 100 (1972); Delahunta v. Waterbury,134 Conn. 630, 634 (1948); Wheaton v. Putnam, 126 Conn. 330, 331 (1940).
The court is obligated to give to the pleadings of the nonmoving party the reading that is most favorable. The defendant appears, at least in the court's view, to confuse two aspects of a nuisance claim. First there must be actionable activity — such as negligence or intentional conduct — and then the four conditions set forth in Green v. Ensign Bickford Co., supra, must be set forth. Nothing in the cases referred to by the defendant preclude the viability of an allegation that the "condition complained of" cannot be the contaminated land itself which because of the contamination causes pollutants to migrate to neighboring land. The pleadings here support such a claim.
The fact that several cases have held that the normal operation of a gasoline station much less a municipal town garage is not in itself a nuisance, cf. Burns v. Lehigh, Inc.,
14 Conn. L. Trib. 722 (1888); Stop Shop Co.s, Inc. v. Amerda Hess Corp,
11 Conn. L. Trib. 7 (1984), or that the recognition of a nuisance claim under these facts may indirectly be allowing a strict liability claim for the operation of underground storage tanks which has otherwise been held to be improper, has nothing to do with the precise legal issue raised by the present motion to strike. These arguments go to whether there is otherwise an actionable nuisance in the first place, not to whether assuming such an actionable nuisance, a condition of the land itself, could be the condition which would have a natural tendency to create danger and inflict injury. Thus, the Restatement (Second) Torts at § 839 states as follows:
 "§ 839. Possessor Who Fails to Abate Artificial Conditions.
 A possessor of land is subject to liability for a nuisance caused while he (sic) is in possession by an abatable artificial condition on the land, if the nuisance is otherwise actionable, and: CT Page 4518
 a) the possessor knows or show know of the condition and the nuisance or unreasonable risk of nuisance involved; and
 b) he (sic) knows or should have known that it exists without the consent of those affected by it, and
 c) he (sic) has failed after a reasonable opportunity to take reasonable steps to abate the condition or to protect the affected persons against it."
(Emphasis added).
That the polluted status of the land as such could be the necessary condition the existence of which is one of the requirements for a nuisance claim, is made clear by the Restatement discussion. Thus, in comment d it says: "Thus, a vendee or lessee of land upon which a harmful physical condition exists may be liable under the rule here stated for the failing to abate it after he (sic) takes possession, even though it was created by his (sic) vendor, lessor or other person and even though he (sic) had no part in its creation." The following illustration is given in comment f.
"Illustrations.
 1. A is in possession of land upon which is situated a tank for storage of petroleum. B is in possession of land 500 yards from this tank. Without A's knowledge or negligence the tank develops an underground leak and a quantity of oil flows out, saturates A's land and drains into an unknown subterranean stream that carries it to B's land. As a result, B's well that supplies his drinking water is polluted and rendered unfit for use. When A learns of this he immediately removes all the remaining oil from the tank but the oil already in his land continues to CT Page 4519 pollute B's well for some time. It is found that A's maintenance of the oil tank was not abnormally dangerous. A is not liable to B for failing to take action to remove the oil already in his land, since it be not be practicable to do so.
The illustration assumes that the polluted status of the land could be the underlying condition necessary to a nuisance action but merely holds liability in nuisance does not lie under the facts set forth because the condition is not abatable. Section 839 may raise questions about the viability of a nuisance claim in this case — is SCASCO a possessor of the land, is the physical condition of the land abatable, would allowance of a nuisance action conflict with a position that strict liability theories of relief should not be allowed under these facts? The Section 839 discussion assumes that the nuisance claim is otherwise actionable". But these precise questions are not before the court and on the specific claim raised in the motion to strike — that there is no "condition" alleged — the court will not grant the motion to strike. Such a narrow view might very well hamper the ability of private citizens to bring nuisance actions in appropriate cases especially if courts are asked to dispose of such claim by means of a motion to strike. The motion to strike the Sixth and Seventh Counts are denied.
3.
The motion to strike is also directed against the Eighth Count which alleges a CUTPA violation.
The count repeats the allegations of the Fourth count to the effect that contaminants have been discharged into CWC's well field because of SCASCO's operation and maintenance of the underground storage tanks and also that SCASCO's conduct was negligent. The CUTPA count then goes on to allege that SCASCO is engaged in trade or commerce as those terms are defined in §42-110a(4), SCASCO has engaged in unfair and deceptive acts in violation of § 42-110 (a) and that CWC is a "business person" affected by SCASCO's unfair or deceptive acts or practices. The Eighth Count then goes on to characterize the conduct of the defendant in such a way as to define it as "unfair" under the court created definitions of that term and further alleges these activities have caused and will continue to cause CWC's loss of CT Page 4520 money and/or property.
Through its motion to strike the defendant SCASCO raises various objections to the CUTPA claim. The first argument is that the count must be stricken because it does not allege the necessary business and/or consumer relationship between the plaintiff CWC and SCASCO.
The plaintiff vigorously disagrees, denies what it perceives as SCASCO's contention that there must be some sort of business relationship between CWC and SCASCO to allow a CUTPA action against SCASCO by CWC. The "business relationship" only requires that the plaintiff have standing to bring the suit. The plaintiff goes on to argue that Larsen Chelsey Realty Co. v. Larsen,232 Conn. 480, 496 (1995) recognizes that three categories of plaintiff have standing to bring a claim under CUTPA: (1) consumers; (2) competitors; and (3) other business persons affected by the unfair or deceptive act. The plaintiff points out that its compliant alleges it is a business person affected by SCASCO's "unfair conduct." As Larsen notes in McLaughlin Ford,Inc. v. Ford Motor Co., 192 Conn. 558, the court had concluded that the act isn't limited to conduct involving consumer injury and that a competitor or other person can maintain a CUTPA action without showing consumer injury. Id. p. 506, 507. CWC also argues that SCASCO's reading of Larsen would give no meaning to the language "other business person" affected by the unfair practice.
Standing and issues related to it, however, cannot be determined by a linguistic analysis. When examining the right to relief under a broad statutory scheme the goal of the legislation must be examined. In other words, Larsen recognized the broad remedial purposes of CUTPA and specifically held that CUTPA imposes no requirement of a consumer relationship. Larsen,
however, did not dilute the relevance of the observation inJackson v. R.G. Whipple, Inc., 225 Conn. 705, 725-726 (1993) that "it strains credulity to conclude CUTPA is so formless as to provide redress to any person for any ascertainable harm caused by any person in the conduct of any `trade' or `commerce'." If the plaintiff's reading is given to "other business person" the focus then becomes the harm inflicted by one business on another but, if that is so, why limit relief to business people? Why not say any person harmed by some unfair act or practice has a right to relief under CUTPA? But the act wasn't passed to protect businesses from harm as such, the focus in the federal and state act is on "unfair" and that is defined in terms of the CT Page 4521 appropriate and just operation of a particular market or type of commercial activity. What is the way out of this riddle? A good place to start is the purpose of the Federal Trade Commission Act enacted in 1914 on which our act was modeled and to which our statute refers for guidance. When first passed the act only forbade "unfair methods of competition in commerce." It was designed to bolster and supplement the Sherman Act and the Clayton Act. The object of the Trade Commission Act "was to stop in their incipiency those methods of competition which fall within the meaning of the word `unfair'." F.T.C. v. Raladam Co.,283 U.S. 643, 647 (1930). The object of the act and the Clayton Act was said to be "to advance the public interest by securing fair opportunity for the play of the contending forces ordinarily engendered by an honest desire for gain." F.T.C. v. Sinclair Co.,261 U.S. 463-476 (1923). In 1938, the act was amended to ban also "unfair or deceptive acts or practices in commerce." The amendment "was designed to make `the consumer, who may be injured by an unfair trade practice, of equal concern, before the law, with the merchant or manufacturer injured by the unfair methods of a dishonest competitor.'" F.T.C. v. A.P.W. Paper Co. Inc.,328 U.S. 189, 193, footnote 4. After the 1938 amendment, the FTC could focus on direct protection of the consumer whereas formerly it could protect the consumer only indirectly by protecting competitors and ensuring the fair operation of competitive markets. Pep Boys — Manny, Moe Jack, Inc. v. FTC, 122 F.2d 158,161 (CA3, 1941).
What then did our supreme court in Larsen mean when it said, as noted previously, that CUTPA was not limited to conduct involving injury to the consumer and that a competitor or other business person can maintain a CUTPA action without showing consumer injury, 232 Conn. at p. 496? To answer this question it must be recognized that when the FTC adopted the "cigarette rule" it did so to define what practice is "unfair" under the federal act. The federal supreme court cited the rule in FTC v. Sperry Hutchinson Co., 405 U.S. 233, 244, fm. 5 (1972). But the Supreme Court and our high court did not want to confine the ambit of the test defining what is "unfair" only to "unfair acts or practices" and not extend it to "unfair methods of competition" as that term is used in 15 U.S.C. § 45 and § 42-110b.
 "The `Cigarette Rule' standard has been extended under CUTPA to apply not only to consumer relations but to other commercial relations such as competitor relations. This CT Page 4522 is consistent with the United States Supreme Court's parenthetical inclusion of `competitors or other businessmen' along with consumers when it quoted the Cigarette Rule language in S H." (S H is the Sperry v. Hutchinson Co case just referred to).
 The Connecticut unfair Trade Practices Act,
Langer, Morgan, Belt (1994) § 2.2 Unfair Acts or Practices, at page 13.
Thus in McLaughlin Ford Inc. in referring to the third requirement of the Cigarette Rule the Court said: "Although the Commission was focusing upon substantial injury to consumers, one commentator has claimed that the test is equally applicable when a business person or competitor claims substantial injury.", 192 Conn. at page 570.
In other words, the use of this "other business person" language was not intended to expand the operation of the federal act or CUTPA beyond the original purposes of these acts — the preservation of fair competitive markets and the direct protection of consumers which was the whole aim of the legislative endeavor in the first place. Thus, when Larsen said CUTPA did not depend on a consumer relationship but was also designed to protect competitors and other business people it meant that protecting those underlined entities was necessary to ensure fair competition. The latter goal requires giving protection to direct competitors but also at times to business people who have that type of a commercial relationship to the alleged wrongdoer which is such that the latter's unfair and deceptive acts might deleteriously affect fair competition in a particular market place. Such an area might be for example, manufacturer — area dealership cases, cf McLaughlin Ford Inc. v.Ford Motor Co., supra, where it is difficult to define the business entities involved as competitors or consumers as those terms are usually understood.
In any event, if Larsen is closely examined at pages 496-497, the court after first saying CUTPA violations do not arise only from consumer relationships and quoting the "other business person" language goes on to say at 232 Conn. Page 497:
 Second, the legislative history of CUTPA reveals that, although consumers were CT Page 4523 expected to be a major beneficiary of its passage, the act was designed to provide protection to a much broader class. According to Representative Howard A. Newman, who reported the CUTPA legislation out of committee to the House of Representatives, the act "gives honest businessmen great protection [against] deceptive or unscrupulous [businessmen] who by unfair methods of competition and deceptive advertising, etc., unlawfully divert trade away from law abiding businessmen." 16 H.R. Proc., P.t. 14, 1973 Sass., p. 7323. Other supporters of the bill made similar comments. See, e.g. Conn. Joint Standing Committee Hearings, General Law, P.t . . . 2, 1973 Sass., p. 724, remarks Stuart Dear, a member of the board of directors of the Connecticut Consumer Association (CUTPA will "assist the businessman in not losing out to those members of the business community who won't play fair"); Conn. Joint Standing Committee Hearings, General Law, P.t.. 1, 1978 Sass., pp. 307-308, remarks of Assistant Attorney General Robert M. Larger (CUTPA covers transactions "between one business and another business").
The "broader class" sought to be protected against unfair trade practices beyond consumers are competitors or other business people harmed in the competitive market place who thereby lose business that should have otherwise been theirs as a result of their hard work and fair dealing. The act wasn't meant to protect any individual or business who happened to be harmed no matter what the context or relationship between the wrongdoer and the claimant.
Protecting the fair operation of competitive markets and directly protecting consumers that, at least to the court, appears to be the proper ambit of CUTPA.
That is, CUTPA and its federal counterpart protect two classes or deal with two sets of problems. First, there is the protection of consumers from unfair or deceptive acts or practices. Then there is a concern with ensuring fair competition CT Page 4524 and in order to accomplish that end, competitors and other business people can bring a CUTPA action. But at the very least, other business people, who are not direct competitors, must have some type of commercial relationship with the alleged wrongdoer commercial relationship not being so much a business to business relationship but some kind of relationship in the market place so that the particular acts of wrongdoing alleged will interfere with fair and open competition in that particular marketplace.
Applying these principles to this case it is obvious that CWC has no consumer relationship with SCASCO. Also, the alleged conduct of SCASCO has nothing to do with protecting the fair operation of any competitive market CWC operates in as a competitor of SCASCO or as a business having such a relationship with SCASCO, whether as competitor or not, so that SCASCO's unfair or deceptive conduct would affect the fair operation of any market in which CWC competes.
Another way of analyzing this question is to note that § 42-110 b(c) gives the commissioner of consumer protection the power "to establish by regulation acts practices or methods which shall be deemed to be unfair or deceptive in violation of" §42-110b (a). Section 42-110d sets forth a whole administrative enforcement procedure. Can it really be seriously argued that the alleged conduct of SCASCO in polluting CWC's well field, improper as that may be, was the type of conduct that anyone drafting this legislation expected the commissioner of consumer protection to regulate in the absence of a consumer, competitor or other type of business relationship between the two companies having something to do with ensuring C.W.C. had a fair arena to operate in competition with others? The answer would have to be no and if that is so, how can a private cause of action be allowed seeking to enforce the same section, § 42-110b(a)? The motion to strike the Eighth Count is granted only on this ground.
4.
The Court grants the request to relief for attorney's fees based as it is solely on CUTPA.
* * * *
The motion to strike is denied as to fourth, fifth, sixth and seventh counts but granted as to eighth count and as to the request for attorney's fees CT Page 4525
CORRADINO, J.